## CASTNER v. COFFMAN.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FOURTH CIRCUIT.

No. 113. Argued January 23, 24, 1900. — Decided May 21, 1900.

On the facts as detailed in the opinion of the court, it is *held* that there was no error in the decree of the court below.

THIS suit was commenced on March 12, 1897, in the United States Circuit Court for the District of West Virginia, sitting in equity. On the date mentioned a bill of complaint was filed on behalf of Samuel Castner, junior, and Henry B. Curran, copartners, trading under the firm name of Castner & Curran. The defendant named in the bill was W. H. Coffman, doing business under the name of Pocahontas Coke and Coal Company and W. H. Coffman Coke Company. The relief prayed was substantially that the defendant might be perpetually restrained from using or imitating the name Pocahontas in connection with the selling, advertising or offering for sale, of coal. The relief thus asked for was based upon the averment that the word Pocahontas was a trademark for coal, which trademark was owned by the complainant firm, and besides that the word in question had come in the course of business to designate the coal offered for sale by the complainants, and that the use of the name by the defendant was calculated to deceive the public into believing that the coal dealt in by him was coal which had been inspected and graded by the complainants, and would thus operate to defraud the complainant, and constituted undue and unlawful competition in trade.

Affidavits and exhibits were filed with the bill in support of a motion for an injunction. A demurrer to the bill having been overruled, the defendant filed an answer, accompanied by affidavits and exhibits in opposition to the motion for an injunction. Several affidavits in rebuttal were thereupon filed on behalf of the complainants. Upon the record thus made the motion for

an injunction was heard, and, after consideration by the court, it was decreed as follows:

" That the defendant in his own name, and in the name of the Pocahontas Coke and Coal Company, and in the name of the W. H. Coffman Coke Company, and his servants, attorneys, associates, confederates, agents and workmen, and each and every of them, be and the same are restrained and inhibited from using the name 'Pocahontas' or 'Pocahontas Flat Top', in connection with his business, the court being of the opinion that the complainants have a right to use the said word 'Pocahontas' for the purpose of indicating that the coal was from the Pocahontas field, and that the complainants have the sole right to use said word as indicating the character of coal they sell. But this injunction is not to restrain or inhibit the defendant or his agents from advertising, offering for sale or selling coal from what is known in Virginia, or West Virginia, as the Pocahontas coal field, or advertising the coal as so mined and produced from that field, and this injunction shall not apply to transactions of the defendant already concluded by actual shipments of coal."

The defendant appealed to the Circuit Court of Appeals for the Fourth Circuit. Among the assignments of error filed was the following:

" II. The court erred in rendering any decree at all until the merits of the said cause, as put in issue by the pleadings, were fully developed by proofs adduced in the proper order of chancery proceeding and practice."

The Circuit Court of Appeals reversed the decree of the Circuit Court and remanded the cause, with directions to dismiss the bill. It was held that the complainants had no trademark in the word Pocahontas; that they were not entitled to the exclusive use of that word to designate the coal sold by them, or its character or quality, but, on the contrary, that the word Pocahontas indicated coal mined in the Pocahontas coal field, and that all the producers of that region had the right to use it in common with the complainants. The court held that the proof did not show that the defendant had practiced any deception on the public or that he had perpetrated any fraud upon the ap-

pellees.    Before the mandate issued, however, a rehearing was applied for, and the reviewing court was asked to provide in the mandate, after reversing the order granting a preliminary injunction, that the parties should "proceed to take their proofs in order that the cause may thereafter be heard upon pleadings and proofs, to the end that a final decree may be entered." This petition for a rehearing was denied, the court stating:

"We are clearly of the opinion, not only that complainants below are not entitled to an injunction, but also that there is no equity in their bill, and that, therefore, it will be a useless expenditure of time and money, and cause fruitless delay, to take the evidence mentioned in the petition for a rehearing."

The cause was then brought to this court by writ of certiorari.

*Mr. Arthur von Briesen* and *Mr. Frederick P. Fish* for Castner.   *Mr. Henry E. Everding* was on their brief.

*Mr. E. B. Stocking* for Coffman.

MR. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

The complainants in their bill predicate their asserted right to the sole and exclusive use of the name Pocahontas, as applying to coal, upon two grounds: First, the ownership of the alleged trademark, which it is averred the complainants acquired from the Southwest Virginia Improvement Company in April, 1895; and, second, upon a use by the complainants and their predecessors in right of the word Pocahontas as a trademark or name to designate the character and the quality of the coal dealt in by them.   In other words, the complainants contend that for many years prior to the period when they assert they were vested by the Southwest Virginia Improvement Company with the ownership of the alleged trademark they, as licensees of said company, used the word Pocahontas to designate the coal sold by them, to such an extent that that word, as applied to coal, came to represent in the public mind the coal of the complainants; that this continued up to the time the trademark was acquired, and from that time down to the filing of the bill.

Whilst the propositions above stated portray the rights asserted by the complainants in their bill, in their proof and in the argument at bar, a wider contention is advanced—that is, that the complainants have a right to the name Pocahontas, not only because they acquired it whilst acting under a license from the Southwest Virginia Improvement Company and as the assignees of a trademark owned by that company, but that they have a right to the name Pocahontas independently of the existence of any such right in the Southwest Virginia Improvement Company, or of the ownership by that company of a trademark embracing that name. Without stopping to consider the conflict which is engendered by this latter view, we shall at once proceed to an analysis of the evidence in the record, for the purpose of ascertaining whether the complainants have the exclusive right claimed by them, derived either as licensees or assignees of the Southwest Virginia Improvement Company, or in any other way.

The coal which was the subject of the dealings had by the complainants as averred in their bill, was the product of what is known as the Great Flat Top coal region of Virginia and West Virginia. It is referred to in the bill of complaint as "a tract or field of smokeless bituminous or semibituminous coal." The initial operations in the development of the region were begun in 1881 by a Virginia corporation styled the Southwest Virginia Improvement Company. Some surface work was done in the fall of that year. In March, 1882, the first blast was put in what was termed the east mine; a contract was closed to run that mine one mile; also the air course and the No. 1 west mine. These mines were situated respectively east and west of a stream called Coal Branch. As early as March, 1882, a contract was made to supply coal from these mines to the Norfolk and Western Railway Company. The branch of that road to the mines, however, was not completed until March, 1883, and the first shipment of coal was made in that month. As a result of the operations referred to a mining town was located near to the mines, and was called Pocahontas. It was made a post office in 1882. It had a population in January, 1883, of one thousand souls, and was incorporated by the legis-

lature of Virginia in 1884 under the name of Pocahontas. The Improvement Company also named its mines the Pocahontas mines, and from the beginning appears to have sold the product of its mines as Pocahontas coal.

Without minutely tracing the development of the coal field in question, it may suffice to say that either by acquiring coal lands from the Southwest Virginia Improvement Company, or from other sources, a land company, known as the Flat Top Association, became interested in lands within the coal field in question, and by 1885 several mines additional to those owned by the Southwest Virginia Improvement Company were being worked by other operators. The connection of the complainants or their predecessors with the mines or coal field in question arose as follows:

While it is alleged in the bill that "some time prior to January, 1884," Castner & Company, Limited, a corporation, "dealt in, inspected and sold coal from such region or field aforesaid," there is no proof in the record even tending to show that Castner & Company had any connection with Pocahontas coal prior to January 1, 1885. Indeed, as it will hereafter develop, the fact that they did not represent that article is clearly inferable from a statement made by them in an application for the registry of an alleged trademark.

It is established that in July, 1883, one William Lamb was the agent of the Southwest Virginia Improvement Company, at Norfolk, Virginia, and that the general sales agent of the company was one Edward S. Hutchinson, who was located in Philadelphia, at which place the general offices of the company were established. Castner & Company, Limited, became the general tidewater coal agent on January 1, 1885, for the product of all the mines then in operation in the Great Flat Top coal region, including the product of the original Pocahontas mines. This appointment was the outgrowth of an agreement entered into between the Norfolk and Western Railroad, the Southwest Virginia Improvement Company, the Flat Top Coal Company and three lessees of the latter company operating coal mines in the region referred to. This agreement was made on the 29th of December, 1884. It provided for the handling of the entire

coal output of all the then producers, and of any subsequent operators in said region, by a general coal agent, to be appointed by the railroad company. The contract, moreover, provided for the appointment by the railroad company of another person, to be known as the general tidewater coal agent, and who was to be subject to the general direction and management of the general coal agent. It was also stipulated in the contract that the general coal agent should perform outstanding contracts of the Southwest Virginia Improvement Company for the delivery of coal. Castner & Company, Limited, were appointed the general tidewater coal agent under the agreement.

In passing, it is proper to notice the fact that the coal mined in the various collieries in operation at the date of this agreement, as is the case with the mines now being operated, was from the same seam as that mined at the original Pocahontas mines, which seam was then known as the "Nelson or Pocahontas bed, No. 3." It clearly appears from the record that prior to the date of the contract above mentioned, at a time when the predecessors of the complainants appear to have had nothing to do with the product at the Pocahontas mines, the coal mined from the Pocahontas vein had become well and favorably known as a coal of high grade. Thus, in a letter from sales agent Hutchinson, dated July 5, 1883, he states: "We are all especially pleased with the testimonial from Mr. McCarrick, and it confirms the view we have all along entertained, that the Pocahontas coal is the best steam coal in the market." So, also, in the eighth article of the contract between Castner & Company, Limited, and the railroad company, by which the former was appointed the general tidewater coal agent, it was recited that, "The coal from the Great Flat Top coal region has proved to be of superior quality, and suitable for steam purposes, and especially for the use of ocean steamships, as well as for sale in the West Indian and South American markets." That the coal supplied by the producers might, however, in some instances, be of inferior quality was recognized in a stipulation contained in the coal producers' contract, providing for an allowance to be made to purchasers of coal because of inferiority of quality, such allowance to be deducted from any amount found due or that might become due to the producer.

While the contract between the coal producers and the agreement appointing the general tidewater coal agent are contained in the record, the agreement appointing the general coal agent was not put in evidence. One of the complainants, in an affidavit dated March 18, 1897, attached as an exhibit a monthly statement rendered by the coal agent, which is headed "Office of the General Coal Agent, Roanoke, Virginia, February 15, 1885." Nowhere in the statement however, is there an intimation as to who was such coal agent. It is plainly inferable, however, from the excerpt which we now make, who was the appointee to that responsible position. The extract we make is from the issue of October, 1891, of a publication styled, "The Iron Belt." It reads as follows:

"POCAHONTAS COMPANY.

"The Pocahontas Coal Company, organized January 1, 1895 (1885?). Officers: William C. Bullitt, president; D. H. Matson, secretary and treasurer; H. N. Claxton, general agent; John Twohy, superintendent piers, Norfolk; general office, Roanoke, Va.; branch office, Norfolk, Va.; shipping office, Bluefield, W. Va. This company, who makes all sales for the entire output of the region, assuming all liabilities, shipped during the year 1890, 1,807,716 tons, and has shipped during the present year to date (October 10th), 1,628,927 tons. 'From present indications,' says Mr. Matson, secretary of the company, 'we estimate that for the year 1891 we will ship 2,300,000 tons.'

"The Pocahontas Coal Company makes a uniform price for all coal mined, furnishes inspectors for each tipple where the coal is loaded, thus guaranteeing to purchasers coal free from bone, slate and other impurities. This company pays the operators by check the fifteenth day of each month, thus securing them against losses by reason of bad debts, storage and freight rates. The company employs twenty-six sub-inspectors, who are under the supervision of Mr. W. D. Milne, chief inspector. Mr. Milne's headquarters are at Bramwell, and he makes a tour of inspection of each tipple at least once a week."

So, also, there is contained in the record a letter, headed with the names of the then officers of what is termed "Pocahontas

Coal Company, shippers.of celebrated Pocahontas coal." On this letter head was a vignette, presumably the figure of Pocahontas. This letter was addressed to the proprietors of the Indian Ridge Colliery, and referred to the handling by the Pocahontas Coal Company of the product of that colliery. The Indian Ridge Colliery, referred to in this letter, is one of the mines represented by the defendant in this cause. The operation of this mine was commenced about the date of the letter, and its product, in accordance with the general agreement already stated, was shipped through the general coal agent, the Pocahontas Coal Company.

In the article in The Iron Belt, above referred to, there is also a statement of the production from 1883 to 1891 of the various mines controlled in October, 1891, by the Pocahontas Company, as the general coal agent of all the mine owners or operators. This statement showed that from one colliery operating in 1883 the number of collieries had increased to nineteen in October, 1891.

Under the coal producers' agreement, as we have seen, the entire product of the mines in the Great Flat Top coal region, intended for rail transportation other than that used for coke, was to be consigned to the general coal agent, and only a portion of such product was to be handled by the general tidewater coal agent, whose operations were to be "subject to the exclusive control, supervision and direction of the general coal agent."

We have already referred to the fact that when the combination referred to was formed the coal mined from the Pocahontas, or No. 3 bed, had, under that name, an established reputation. Further confirmatory evidence of this fact will now be referred to. Andrew S. McCreath, chemist to the state geological survey, of Pennsylvania, embodied the results of much research and personal investigation during part of 1882, and the fall of 1883, and the spring of 1884, in a work entitled "Mineral Wealth of Virginia," extracts from which are contained in the record. At page 110 he mentions the existence of numerous openings on the "Nelson or Pocahontas coal bed (No. 3 of the section,)" and also of some few openings

on the upper beds, No. 5 and No. 6.   He further says (p. 110):

·  " On Coal Branch, the Pocahontas bed (No. 3) has been extensively mined at the Pocahontas mines of the Southwest Virginia Improvement Company."

At page 150 he says:

" The section at Pocahontas shows the presence of at least three workable beds above water level, although almost the entire output of the region at present comes from the No. 3 Nelson or Pocahontas bed.

" This handsome coal bed is everywhere present, so far as explored, with a workable thickness, being 11' 3" in the vicinity of Pocahontas, and holding its workable dimensions through the field for five miles eastward to the waters of Flipping Creek, where it becomes split into two beds, about $4\frac{1}{2}$ and $5\frac{1}{2}$ feet thick.

" To the west of Pocahontas, along Laurel Creek, for a distance of eight miles, the bed carries its full thickness fairly well, and shows nearly the same section for a long distance north of the dividing ridge on the waters of the Elkhorn and the Tug Fork of Sandy.

   *   *   *   *   *   *   *   *

" The good quality of this coal has been well established by numerous tests, both in the laboratory and in actual practice."

The Pocahontas Coal Company appears to have continued to act as general coal agent of the producers' combination until the spring of 1895, about the time of the appointment of a receiver for the Norfolk and Western Railroad, which company, as will be remembered, was a party to the original agreement of the combination.   By this time the development of the coal field in question had largely progressed, and a number of additional mines were being operated.  A new company, called the Pocahontas Company, was chartered on March 12, 1895, and in 1896 this company was handling the coal produced from numerous mines in the Pocahontas field.   Agreements were made, however, by the complainants in March, 1895, directly with some of the mine owners formerly represented by the Pocahontas Coal Company, (among them the Southwest Virginia Improvement Company,) by which agreements complain-

ants were constituted the general factors and selling agents for the product of the mines of such owners.

The product of the Indian Ridge mine, now represented, as we have said, by the defendant, and which was opened in the spring of 1894, when it ceased to be shipped through the Pocahontas Coal Company, as general agent, was marketed through the agency of the complainants until January 1, 1896. From this last mentioned date until November 1, 1896, the product of the mine was shipped through the Pocahontas Company, the complainants having become the sole agents of the latter company for tidewater and line trade.

It is plainly inferable from the averments of the bill, as it is unquestionably established by the evidence in the record, that from January 1, 1885, the date of the coal producers' combination referred to, the product of the various collieries controlled by the combination was uniformly termed Pocahontas coal, and the evidence shows that this appellation was made use of as well upon bill heads and advertising matter of the general coal agent, and of some, at least, of the producers, as upon the stationery and advertising matter of Castner & Company, Limited, the general tidewater coal agent.

It is by the light of the facts just stated that we come to consider the claim made in the bill that the complainants are the exclusive owners of the trademark or the trade name Pocahontas, as applied to all coal coming from the Pocahontas coal field, because prior to April 1, 1895, they had used the same by the license and permission of the Southwest Virginia Improvement Company, and subsequent to that date had used it as owner under an assignment of said trademark or trade name to them from the Improvement Company. There is no evidence whatever in the record tending to show any express license to complainants or their predecessors from the Southwest Virginia Improvement Company, authorizing them to use the name Pocahontas as an exclusive trade name or trademark for coal; and the facts which we have above stated render it absolutely impossible that there should have been any such valid license. It is patent that the word Pocahontas, prior to the formation of the coal producers' combination on January 1, 1885, indicated

all the coal coming from a particular seam of coal known as the Pocahontas vein. When the combination was entered into, creating a general coal agent to dispose of all the coal to be marketed from all the collieries which were then being worked or might thereafter be worked in the Pocahontas region, it is undoubted that the name Pocahontas was applied by everybody concerned, including the Southwest Virginia Company, as indicating coal coming from the region, without reference to the particular mine from which it was taken, for all the coal was advertised by the owners and general coal agent under the name of Pocahontas coal, and was contracted for and shipped under the same name. Indeed, during the existence of the original combination the complainants, or their predecessors, who now assert that they have an exclusive right to the name Pocahontas as designating the coal sold by them, were acting as tidewater agents under the supervision and control of the general coal agent, for all the mine owners, and were themselves selling the coal under the name referred to as agents of the owners, and dealing in such coal, on behalf of the owners of all the mines, as Pocahontas coal. When the Pocahontas Coal Company ceased to act as the general coal agent, on the appointment of a receiver of the Norfolk and Western Railroad, the complainants, who now assert the exclusive right in themselves to the name Pocahontas, became the principal agent for the sale of the coal from some of the mines, among the number one of the mines controlled by the defendant, putting the product of that mine upon the market, as agent of the owner, as Pocahontas coal.

Destructive as is this state of the proof of the assertion that there was a license to the complainants prior to 1895 by the Southwest Virginia Improvement Company, the existence of such a license is further rebutted by the fact that there is no evidence of any want of knowledge by the Southwest Virginia Improvement Company of the use by the Pocahontas Coal Company or by the producers generally of the designation Pocahontas as the name of the coal mined in any and all of the collieries in operation in the region. Indeed, the exaggerated character of the assertion of the complainants, that prior to 1895 they

used the trademark as the licensees of the Improvement Company, is shown by the record. In August, 1885, Castner & Company, Limited, was under the contract the general tidewater coal agent, that is, such agent for all the mine owners in the Pocahontas region. Although thus representing the owners, this corporation, on the 25th of August, 1885, filed an application for the registry of a trademark, in which it was recited that Castner & Company, Limited, had adopted for its use as a trademark for coal the word "Pocahontas," and that the same had been continuously used by said corporation "since about January 1, 1885." This date, it will be remembered, was when the corporation referred to became the general tidewater coal agent for the producers of Pocahontas coal. In an affidavit deposing to the truth of the statements contained in the application, it was stated :

"That said corporation (Castner & Co., Limited,) has a right to the use of the trademark therein described; that no other person, firm or corporation, has the right to such use, either in the identical form or in any such near resemblance thereto as might be calculated to deceive."

The conflict between the claim of license made in the bill and these sworn assertions in the application to register a trademark requires no comment. The record, however, shows a further contradiction. Turning to Exhibit B, attached to the bill, which is the alleged assignment of trademark made in 1895 by the Southwest Virginia Improvement Company to Castner & Company, Limited, and under which complainants claim to be the owners of the trademark Pocahontas, as applied to all coal, we find it recites that Castner & Company, Limited, had been appointed on March 26, 1895, the agents to sell all the output of coal of the mines of the Improvement Company, which coal "has become known under the trade name, or mark, 'Pocahontas,' by adoption and continuous use thereof by the said corporation, the Southwest Virginia Improvement Company." Besides this, the document states that the assignor, the Southwest Virginia Improvement Company, "did adopt, on or about the first day of July, 1882, as a trade name, or mark, the word 'Pocahontas' for coal mined in a region or

field opened up and operated in Tazewell County, Virginia, in the year 1882, by the said corporation, the Southwest Virginia Improvement Company, and which trade name, or mark, it continued to use thereafter in its coal mining operations in said region, or field, from the date aforesaid, as the trade name, or mark, for all coal mined and sold by it up to the present time."

Thus we have Castner & Company, Limited, becoming by contract an agent of the mine owners to sell their coal, putting it upon the market as Pocahontas coal, and dealing with it as such, yet filing a claim for a trademark by which it was sought to deprive the owners of the designation which appropriately belonged to their product. We find the bill verified by both complainants, one of whom made oath to the application for a trademark. In such bill it is asserted that at the time the trademark was applied for Castner & Company, Limited, were not the owners of the trademark, but were mere licensees of the Southwest Virginia Improvement Company.

And also it appears that, when in 1895 the complainants became the principal agents of certain of the mine owners, a monopoly of the name of Pocahontas as against all the mine owners was again sought to be obtained by taking a transfer of an alleged trademark or name from the Southwest Virginia Improvement Company, the statements in the paper reciting such transfer being in irreconcilable conflict with the affidavit to the application for a trademark.

But putting out of mind these contradictions, it is manifest that, long prior to the purported assignment by the Southwest Virginia Improvement Company of the alleged trademark or trade name, by the acts of all the parties concerned in the production and marketing of the coal, (including the Southwest Virginia Improvement Company, Castner & Company, Limited, and the complainants,) the name Pocahontas indicated the region from which the coal in question came and the natural quality thereof, and applied indiscriminately to the product of all the mines in that region, producing that character of coal.

Although the facts which we have referred to make inevitable the foregoing deductions, nevertheless we state a few additional facts which make the situation if possible yet clearer.

In the issue of October, 1891, of The Iron Belt, already re-ferred to, the region in question was termed the Pocahontas Flat Top coal region, and the product thereof was frequently referred to as Pocahontas coal or Pocahontas Flat Top coal. So, also, in the agreements made by complainants in March, 1895, (after the producers' combination had ceased to be opera-tive,) to act as sales agent for the product of certain of the mines, there is contained express recognition of the fact that the products of all the mines in that region, whether those products were inspected and controlled by the complainants or not, were usually designated and generally known as Poca-hontas coal. Thus, in a stipulation numbered 3 in an agree-ment made by complainants with the Pulaski Iron Company on March 26, 1895, it is recited:

"It is agreed by the parties hereto that the parties of the second part may act as selling agents for other producers of Pocahontas coal, provided they shall become and continue to be the exclusive agents of such producers, and provided fur-ther that the aggregate amount of coal sold during any year for the party of the first part shall be less than 2.615 per cent of the total amount of Pocahontas coal sold by the parties of the second part during that year."

And in a supplementary agreement with the same company, dated December 28, 1895, it is said:

"That, until the expiration of the said contract of 26th March, 1895, according to the terms thereof, the party of the first part will sell or dispose of no Pocahontas coal whatever save through the agency of the parties of the second part.

*     *     *     *     *     *     *     *

"The parties of the second part hereby promise and agree that in the event of the sale or disposition of any Pocahontas coal by any producer for whom they may at any time be acting as sales agent, except through the agency of the said parties of the second part, that they will at once, on receipt of written notice of the particulars of such sale or disposition from the party of the first part, and upon its written request, forthwith terminate its agency for such producer," etc.

Again, in a supplement to The Daily Telegraph, a publication

at Bluefield, West Virginia, such supplement being entitled "Pocahontas Flat Top Coal Field Industrial Edition," the product of the region referred to is frequently spoken of as Pocahontas coal or Pocahontas coke, etc. And, as bearing upon the claim made in the bill, that the coal from this field had acquired a great reputation in the markets of the world by reason of the expenditures of time and money made by complainants "in inspecting, selecting, grading and otherwise maintaining the superior quality and purity of the said coal," we call attention to a lengthy advertisement of the complainants contained in the publication just referred to, in which appeared no allusion to an inspection of the product, but wherein it was clearly recognized that the wide reputation of Pocahontas coal was the result of making known the inherent excellent quality of the article itself. The product of the mines represented by the complainants, among which mines was the Indian Ridge mine, now represented by the defendant, is frequently referred to in the card as Pocahontas coal. We excerpt portions of the card in the margin.[1]

---

[1] "CASTNER & CURRAN

Are the General Agents for the sale of

Pocahontas Flat Top Smokeless Semi-Bituminous Coal.

---

"Having satisfied themselves by exhaustive analyses and tests that POCAHONTAS COAL was unequaled as a Steam Fuel, they determined to leave nothing undone to demonstrate this fact and establish its reputation as second to no other coal, and owing to their energetic efforts and judicious advertising, POCAHONTAS COAL to-day enjoys the unique distinction of being the only coal in the world that has been officially indorsed by the Governments of Great Britain and the United States. It is always used in testing the speed of Government cruisers built on the Atlantic seaboard, the Secretary of the Navy having issued an order to this effect several years ago. The Cunard and White Star Steamship Companies use it exclusively on their Eastern voyages, and with it have made all their great speed records of recent years. It is conceded to be the Best Fuel for Locomotives and Stationary Engines, and its supremacy as a Steam Fuel is now established beyond dispute.

"THE RECORD OF POCAHONTAS COAL IS THE MOST REMARKABLE IN THE HISTORY OF THE TRADE.

"The first mine was opened in 1883, the shipments for that year amounting to only 75,000 tons.

Now, this advertisement of the complainants makes it clear that they were offering for sale, not the particular product of any one mine, but that the Pocahontas coal which they advertised was derived from numerous collieries within the Pocahontas region. Indeed, when it is considered that coal from the Indian Ridge mine, which the defendant now represents, was for a time represented by the complainants, and the coal therefrom sold by them as Pocahontas coal, the contention now advanced amounts but to this, that an agent can deprive the principal of his property by appropriating it to himself, and that complainants, because they were entrusted, first, in a subordinate capacity as tidewater agents by many of the mine owners and then in a more enlarged capacity as general agent, with power to represent and act for the producers, have come into the position where they can virtually exercise a monopoly of sale as to the product of all the mines in the Pocahontas region by compelling every mine owner in the Pocahontas field to offer no coal on the market unless the description be qualified or unless the coal be confided for sale to the complainants.

It is insisted, however, that the appellate court should have complied with the request contained in the petition for a rehearing, and remanded the cause to permit further proofs in support of the material allegations of the bill. In *Mast, Foos & Co.* v. *Stover Manufacturing Co.*, 177 U. S. 495, we considered the question as to the power of a Circuit Court of Appeals, in reviewing the action of a Circuit Court in allowing a temporary injunction *pendente lite*, upon affidavits, to consider the case upon the merits and direct a final decree dismissing the bill. It was held that the propriety of the exercise of such a power must be determined from the circumstances of the particular case. And it was added:

"In 1895 there were thirty-eight collieries in operation, whose output (including tonnage converted into coke) aggregated 3,500,000 tons.

"Not only is this coal famous for the immense growth of its tonnage, but its reputation has also increased, until to-day it enjoys the distinction of having been officially indorsed as the *best American steam coal by the United States Navy Department, the United States War Department, the British Minister at Washington, all the leading steamship, railroad and manufacturing companies*," etc.

" If the showing made by the plaintiff be incomplete; if the order for the injunction be reversed, because injunction was not the proper remedy, or because under the particular circumstances of the case it should not have been granted; or if other relief be possible, notwithstanding the injunction be refused, then, clearly, the case should be remanded for a full hearing upon pleadings and proofs. *But if the bill be obviously devoid of equity upon its face, and such invalidity be incapable of remedy by amendment;* or if the patent manifestly fail to disclose a patentable novelty in the invention, we know of no reason why, to save a protracted litigation, the court may not order the bill to be dismissed."

As respects the case at bar, we are satisfied from the averments of the bill and the proof that no supplementary evidence could be offered which would alter the indubitable conclusion that no exclusive right to the trademark or trade name Pocahontas exists in the complainants. Further, we concur in the conclusion of the Circuit Court of Appeals, that the bill, upon its face, is devoid of equity. It is fairly to be inferred from the averments of the bill that it charges that while acting as agents of the owner of one of the mines represented by the defendant, and of the owners of many other mines in the same region or field, there was applied by the complainants to the product of all the mines the appropriate designation Pocahontas coal, a description which applied to all the coal produced by the operators in that region, and which was correctly descriptive of such product. Whether, as claimed, the reputation of the coal was enhanced by careful inspection and grading by the complainants or their predecessors, is left conjectural by the record. But if it be conceded that the proof on this branch of the case was certain, it could operate no change of result. In inspecting and grading the coal, complainants and their predecessors were but agents of the mine owners. Certainly, the agent cannot be heard to say that he may appropriate to himself the name belonging to the product of his principal, or that he may affix the name to coal for his own purposes, and not for the benefit and advantage of his principal.

Keeping in mind the circumstances under which the com-

plainants made whatever use they did make of the appellation " Pocahontas," as applied to coal produced from the Pocahontas coal region, we can perceive no just ground for the claim that there was unfair competition in trade, by reason of the acts averred to have been committed by the defendant. In substance, the alleged wrongful acts were averred to consist in the advertising in various forms by the defendant of the coal handled by him, as " Pocahontas " coal, when in fact such coal is a " very inferior and very impure coal." It was also averred, *in the alternative,* that such acts were done with the intent to cause the purchasers of said coal to believe " that the same was sold by your orators, or is *of the quality* of that sold by your orators." The effect of the advertising of the coal handled by the defendant, as " Pocahontas " coal, it is also asserted, is that purchasers of the coal dealt in by the defendant are liable to and will be deceived by such representations into purchasing such coal " as your orators' superior and specially selected coal." It is further averred that purchasers have in fact been so deceived, and that the "reputation of your orators' 'Pocahontas' coal has thereby been tainted." Leaving out of view the emphatic denial of the defendant, that the coal handled by him is in anywise inferior to that handled by the defendant, it is plain from the averments in the bill that the alleged inferiority in the coal is grounded upon the supposition of a want of careful inspection and grading. We do not think, however, that if it were a fact that it had become generally known and recognized by the public that the complainants, while in the employ of the coal producers of the Pocahontas coal field, inspected and graded the product of the mines in such manner as that thereby the reputation of the coal was enhanced, that the owners of mines producing Pocahontas coal thereby lost their right to designate their coal by its appropriate name, because of the possibility that some person, by reason of the coal being termed what it really was, might be induced to believe that it was still inspected by complainants.

As we have already said, in its final analysis, the right which the complainants assert amounts but to the contention that because at one time they were the agents of the owners of coal

mined from the Pocahontas field, and had sold the same as agents for the owners under its correct name, they thereby divested the owners of their property, and have acquired a monopoly of selling all the coal from the Pocahontas field under its appropriate name. We think there was no error in the decree of the Circuit Court of Appeals, and it is therefore

*Affirmed.*