### HARVEY v. AMERICAN COAL CO. et al.
### No. 4468.

Circuit Court of Appeals, Seventh Circuit.
June 27, 1931.
Rehearing Denied July 23, 1931.

Bernard Stroyman, of Indianapolis, Ind., for appellant.

Frederick Van Nuys, of Indianapolis, Ind., and E. L. Greever, of Tazewell, Va., for appellees.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

ALSCHULER, Circuit Judge.

The appeal is from a decree awarding appellees an injunction as prayed in their bill. The suit was brought by 23 nonresident producers and sellers of coal known as "Pocahontas" coal against 18 retail dealers in coal at Indianapolis, Ind., to restrain them from handling or selling coal to which a name is given containing the word "Pocahontas," unless the coal is produced in the Pocahontas coal field as described in the bill, and possesses the properties of "Pocahontas" coal as in the bill alleged.

The bill charges, and the court found, and the evidence abundantly sustains the finding, that Pocahontas coal is a semibituminous, low volatile, smokeless coal, produced exclusively in the Pocahontas coal field, specifically described in the bill, and shown by the evidence to be certain portions of named counties in Virginia and West Virginia, served by certain named railroads; that such coal possesses properties which make it particularly valuable for steam, domestic, and byproduct uses, and that nowhere else is produced coal of like properties and value; that since 1883, when the production of such coal began, its use has constantly and rapidly increased, with constantly increasing market, reaching in 1929 nearly 30,000,000 tons—all produced in said field, and all sold under the name of "Pocahontas" coal; and that in Indianapolis there has for many years been a large and valuable trade in this coal, aggregating many thousands of tons annually. It was further alleged and shown that defendants were advertising and offering for sale various coals of a grade inferior to Pocahontas, and not produced in the Pocahontas coal field, under such names as "Semi-Pocahontas," "Pocahontas Fractured," "Banner Po-

cahontas," and "Wonder Pocahontas," the last named being the name under which appellant was advertising and selling coal. It was alleged and shown that this practice of the defendants tended to induce the buying public to believe that the coal thus offered and sold under such names was in fact genuine Pocahontas coal, produced in the Pocahontas coal field, and that thereby the public was and would continue to be deceived, and the plaintiffs, and others engaged in producing and selling genuine Pocahontas coal, be greatly and irreparably damaged.

The decree ran against the employment of the word "Pocahontas" by any of the defendants in the sale of any coal which was not produced in the Pocahontas field and did not have the properties described. Appellant secured an order of severance, and alone prosecutes the appeal.

These allegations of the bill, and the court's findings sustaining them, were so indubitably sustained at the hearing that we do not feel called upon to discuss the evidence.

The contentions of appellant are set forth in a voluminous brief under eight heads and twenty-eight subheads, and it goes without saying that not all of these require discussion.

■ It is contended that the court had no jurisdiction over the subject-matter because the statutory amount does not appear to be involved. It was alleged that by defendants' conduct plaintiffs have been damaged more than $3,000. Beyond this it appears that each of the plaintiffs had built up a large trade in Indianapolis in genuine Pocahontas coal—collectively, from 20,000 to 30,000 tons monthly for a number of years next prior to the filing of the bill. If it appears anywhere in the record that the jurisdictional amount is involved, it will satisfy the statutory requirement. United States v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 17 S. Ct. 540, 41 L. Ed. 1007; Leitch v. City of Chicago, 41 F.(2d) 728 (C. C. A. 7); Lee Line Steamers v. Robinson, 232 F. 417 (C. C. A.).

■ It is urged that the statutory amount must appear to be involved as to each of the parties plaintiff, and against each of the defendants. What is here involved is the value of the right sought to be protected. In this case it is the trade-name—a thing common to each of appellees and indivisible among them, and of as large value to one alone as to the group. Board of Trade v. Cella Commission Co. et al., 145 F. 28 (C. C. A. 8);

Coca-Cola Co. v. Brown & Allen (D. C.) 274 F. 481. It is the good will—the right to the exclusive use of the name—which is endangered, and the bare statement of the facts conclusively indicates a value many times larger than the jurisdictional amount.

■ It is contended that in such an action there may not be a joinder of plaintiffs who are separate and independent of each other in their business relations. For answer we refer to the opinion of this court in Pillsbury-Washburn Flour Mills Co. et al. v. Eagle, 86 F. 608, 41 L. R. A. 162, where there was an action brought by various flour manufacturers of Minneapolis to restrain the defendant from falsely branding his flour, made in Wisconsin, with the name "Minneapolis." The reasoning of the court in sustaining the right of several parties similarly situated to join in the action is so cogent that without further discussion we adopt it by reference. The same logic applies as well to the contention that defendants who have severally wrongfully appropriated a trade-name may not be joined together in one action.

Under the pleadings and facts appearing, the various defendants are charged with conduct of the same general nature, as constituting unfair competition in trade, in transgressing the rights of the various plaintiffs in and to the same trade-name. We believe that in these circumstances, in the interest of justice and the avoidance of a multiplicity of actions, the single action may be brought by those similarly though severally interested in the same subject-matter against a multiplicity of transgressors who similarly offend.

■ The contention of nonjoinder of parties is based on the fact that others than the plaintiffs are producers of Pocahontas coal within the described coal field, and that the failure to join these others in the action is fatal. In this we cannot agree. The rights and interests of those who were made parties are in no manner prejudiced by the failure of these others to join in the action. The case of Pillsbury-Washburn Flour Mills Co. v. Eagle, supra, is applicable likewise to this contention.

■ The insistence that appellees are chargeable with laches in the bringing of the action is not well founded. While it is true that for about three years the name "Wonder Pocahontas" was used, there is nothing in the pleadings or evidence which lends support to this claim beyond this mere delay, and this ordinarily is not sufficient. Menendez v. Holt, 128 U. S. 514, 9 S. Ct. 143, 145, 32

L. Ed. 526; United Drug Co. v. Theodore Rectanus Co., 248 U. S. 90, 39 S. Ct. 48, 51, 63 L. Ed. 141, affirming (C. C. A.) 226 F. 545; Donner v. Walgreen Co. et al. (D. C.) 44 F.(2d) 637; Stearns-Rogers Mfg. Co. v. Brown, 114 F. 939 (C. C. A. 8). As stated in Menendez v. Holt: "The intentional use of another's trade-mark is a fraud; and when the excuse is that the owner permitted such use, that excuse is disposed of by affirmative action to put a stop to it. * * * Mere delay or acquiescence cannot defeat the remedy by injunction in support of the legal right, unless it has been continued so long, and under such circumstances as to defeat the right itself."

Appellant asserts that the registration in Indiana of the trade-name "Wonder Pocahontas" protects appellant in selling coal bearing that name. It appears that in 1926 one Morris procured registration in Indiana of the words "Wonder Pocahontas" in connection with the sale of "a bituminous coal mined and produced in Trammel and Honeybranch, Dickinson County, Virginia"; and that appellant procured his coal from Morris, but it was not the genuine Pocahontas coal, either in origin or properties.

It is unquestioned that for many years preceding this registration the name "Pocahontas" had been applied to coal of the quality and place of origin as described in the bill. By the hundreds of millions of tons it had been sold throughout the United States —millions in and about Indianapolis.

In the Encyclopedia Britannica (11th Ed.) 1911, vol. 28, p. 119, under the article "Virginia," it is stated: "In Tazewell County is the famous Pocahontas bed, which produces one of the most valuable grades of coking and steam coal to be found in the United States." The article names no other coal. The Supreme Court, in a case decided May 21, 1900, in an exhaustive opinion quotes from a comment on Pocahontas coal: " 'The good quality of this coal has been well established by numerous tests, both in the laboratory and in actual practice.' " The opinion proceeds: "It is patent that the word Pocahontas, prior to the formation of the coal producers' combination on January 1, 1885, indicated all the coal coming from a particular seam of coal known as the Pocahontas vein. * * * It is manifest that * * * the name Pocahontas indicated the region from which the coal in question came and the natural quality thereof, and applied indiscriminately to the product of all the mines in that region, producing that char-

acter of coal." Castner v. Coffman, 178 U. S. 168, 20 S. Ct. 842, 845, 44 L. Ed. 1021.

The Indiana registration could not withdraw from the producers and marketers of this coal the exclusive right they had long theretofore enjoyed to this trade-name as applied to coal of such properties and origin. If this were not so, one having valuable property in a trade-name might be readily deprived of it through ex parte registration of the name by another in some jurisdiction for a different product.

The employment of the term "Pocahontas" in connection with coal of such properties and from such place having long antedated this registration, the language of the Supreme Court in United Drug Co. v. Rectanus Co., supra, is particularly applicable: "There was nothing to prevent the state of Kentucky (saving, of course, what Congress might do within the range of its authority) from conferring affirmative rights upon Rectanus, exclusive in that commonwealth as against others whose use of the trade-mark there began at a later time than his. * * * "

Appellant makes the contention that plaintiffs do not come into equity with clean hands, (a) because Pocahontas is not smokeless, as stated to be, and (b) because one of appellees, Central Pocahontas Coal Company, had also marketed an inferior coal, having a different origin, under the name "Arrow Pocahontas," and was therefore not entitled to the injunction, and that thus none of the appellees were entitled to it. It is true that the commonly stated and generally understood properties of Pocahontas coal are that it is semibituminous, low volatile, and smokeless. The evidence was that the term "smokeless" was used in the comparative sense—that there is more or less of smoke in all coal, but that, compared with that vast amount of bituminous coal, which emits large volumes of smoke, Pocahontas may properly be termed smokeless. This explanation of the word "smokeless," as applied to Pocahontas coal, is reasonable, and is evidently well understood by the trade, and we do not think that deception or bad faith inheres in its use.

As to appellee Central Pocahontas Coal Company, it appears that it was not a producer, but a dealer in coal of various kinds, and, in addition to genuine Pocahontas, it did handle an inferior coal which was called "Arrow Pocahontas." This might well be considered inequitable conduct on the part of this plaintiff, but it would not serve to de-

prive the other plaintiffs of their rights. It further appears that before the decree this party, at the request of his coplaintiffs, definitely discontinued the handling of "Arrow Pocahontas" coal and the use of that name.

 It is argued that the registration was public, and that buyers in Indianapolis could have ascertained in the state house there that "Wonder Pocahontas" coal was not produced in the Pocahontas field, and that therefore buyers of it were not deceived. It occurs to us that about the only "wonder" in connection with the matter would be as to how many buyers of coal would or might reasonably be expected to examine the records at the state house to ascertain whether "Wonder Pocahontas" originated from a place different from that of Pocahontas, or was of inferior quality. The contention is too far-fetched to have any bearing.

We are referred to a number of cases wherein such relief was denied. Perhaps the leading case is French Republic v. Saratoga Vichy Spring Co., 191 U. S. 427, 24 S. Ct. 145, 48 L. Ed. 247. The French government sought to restrain the use of the word "Vichy" because calculated to deceive the public into the belief that the product was of the famous Vichy springs of France, which, under the name "Vichy," had long enjoyed an extensive trade in the United States. While the court pointed out that twenty-five to thirty years of acquiescence in the use of the name complained of might indicate such laches as would defeat recovery, it did not decide the case upon that ground, but upon the proposition of the manifest difference in the waters, one being a still water and the other efferverscent, as well as in the appearance of the labels under which the respective waters were sold, concluding that the public could not have been deceived into buying the domestic article upon the belief that it was the imported Vichy water.

It might be added that Saratoga was a place in this country widely known for its potable mineral waters, and that the qualification "Saratoga" would tend to indicate to the American public that the waters were in fact domestic and not imported.

Here there was no question of similarity in appearance of product or of commercial dress of packages. Coal is not packed or labeled, and to the average person it all looks quite alike, though differing widely in properties. The word "Wonder" does not tend to indicate a different place of origin nor an inferiority of properties. If it tended to indicate any difference at all, it would be that

the coal which appellant sold was in fact a genuine Pocahontas coal in all respects save only that it was a superior article even for that variety.

We are satisfied that the words "Wonder Pocahontas" are calculated to deceive the buying public not less than if the word "Pocahontas" had been alone employed as a trade-name for coal which had not the properties nor the origin of the genuine, and we see no reason for disturbing the decree, which is accordingly affirmed.