### DONNER v. WALGREEN CO. et al.
### No. 8438.

District Court, N. D. Illinois, E. D.

Nov. 8, 1930.

638

Williams, Bradbury, McCaleb & Hinkle, of Chicago, Ill., for plaintiff.

Glenn S. Noble, of Chicago, Ill. (Hugh K. Wagner, of St. Louis, Mo., of counsel), for defendants.

LINDLEY, District Judge.

The plaintiff originally filed suit against the Walgreen Company charging infringement of patent 1,379,855 to Donner May 31, 1921, upon application filed March 3, 1921, covering depilatories for removing hair from the human body, by the sale of various depilatories, viz. Delatone, Nu-Del, X-Bazin and Odo-Ro-No. Subsequent to the commencement of the suit, settlement was made with the manufacturers of Nu-Del and Delatone, and Neet, Inc., intervened as party defendant and is charged to infringe the patent by the manufacture and sale of the depilatory paste Neet. The defenses are invalidity, noninfringement, and estoppel by way of laches.

In his specifications Donner stated that his invention related to a toilet preparation known as a depilatory used for the removal of hair from the human body; that the principal object of his invention was the preparation of such a depilatory in the form of a cream or paste by the incorporation of a depilating agent in an air-restraining base resulting in a finished depilatory or depilating cream or paste, permanent and stable, which could be applied directly to the skin without the intervention of water or other substance, and which would effect the removal of hair with facility and with perfect safety to the skin. His claims, some seventeen in number, ten of which, viz. 1, 2, 3, 6, 7, 9, 13, 14, 16 and 17, are in suit, are brief and not most artfully drawn. The ten claims are in the margin.[1]

No. 7 is a typical representation of the composition of plaintiff in this case as to his invention, viz. "a composition of matter comprising a depilatory mixture and a colloid carrying the same, in the form of a finished, stable depilatory paste." Under well-known principles, these claims are to be read as if they contained the words "substantially as described." See Matthews v. Shoneberger (C. C.) 4 F. 635; Olds v. Brown (C. C.) 41 F. 698; Jewell Filter Co. v. Jackson (C. C. A.) 140 F. 340; National Tube Co. v. Mark (C. C. A.) 216 F. 507.

Donner recognized that efficient depilatories had been made previously in the forms of powder, liquid, and lotion, and stated that the physical states of these were such that their application was invariably attended with inconvenience or waste of material or both; that because of their fluidity they were apt to flow or spread over a greater area than intended for the application; that it was difficult to confine them to the removal of hair in a small localized area without acting on the adjacent skin; that the lotion depilatories were imperfect suspensions of alkaline and alkaline earth sulfids, polysulfids and sulfhydrates in water; and that in all of these the dissolved sulfhydrates constitute the active depilating agent. He pointed out further defects in existing depilatories, and stated that he had overcome these difficulties by taking advantage of the air-restraining properties of colloids and colloid-like bodies, which are capable, when mixed with the depilating agent and any suitable vehicle, of producing a paste or cream-like mass, in which the molecules of the depilating agent are permanently

[1] "1. A composition of matter, for the purpose specified, comprising a depilatory in the form of a substantially permanent cream or paste.

"2. A composition of matter comprising a depilatory mixture and a vehicle carrying the same, in the form of a finished, stable, depilatory cream.

"3. A composition of matter for the purpose specified, comprising a depilating agent incorporated in an air-restraining base."

"6. A composition of matter comprising a depilating agent permanently suspended in a vehicle in the form of a finished creamy plastic mass.

"7. A composition of matter comprising a depilatory mixture and a colloid carrying the same, in the form of a finished, stable depilatory paste."

"9. A composition of matter for the purpose specified, comprising an aqueous solution of a depilating agent, and a mineral suspensoid colloid permanently suspended in said solution."

"13. A depilatory cream consisting of a depilating sulfid and sulfhydrate mixture, and sufficient colloidal agglutinant to maintain the whole substantially stable and homogeneous.

"14. A cream depilatory consisting of an alkaline earth sulfid solution in admixture with a vehicle containing sufficient colloid-like adhesive to maintain the whole substantially stable and homogeneous."

"16. A depilatory comprising a depilating agent consisting of the products of interaction of hydrogen sulfid and slaked lime, in admixture with sufficient colloid-like agglutinant to form a creamy mass.

"17. A depilatory cream comprising a depilating agent consisting of the products of interaction of hydrogen sulfid and slaked lime, in admixture with light magnesium oxid."

suspended, thus rendering them proof against the substantial entrance of and interaction with air, and guaranteeing stability and permanence of the preparation.

The word "permanently" is obviously used in a relative sense. As a typical example of his method of manufacture, he stated that he placed a quantity of quicklime (CaO) in a large vessel and slaked it by pouring upon it approximately four times its weight of water. He specified, however, that he did not wish to be limited to the exact proportions outlined. His method was to make first of all a mass of calcium hydroxid, to add thereto sufficient water to bring the same to a thin consistency, that is, about ten parts of water to one of lime, straining this through gauze to remove foreign matter, and then to pass a current of hydrogen sulfid gas, constituting his depilating agent, through this magma until it assumed an even pale blue color. His last step was to add calcined magnesia or equivalent chemicals in sufficient quantity to produce the consistency of a pasty mass of cold cream or tooth paste. His conclusion was that dissolved sulfhydrates constitute the active depilating agent, and that if the same were in a liquid or lotion form upon the opening of the receptacle air would enter and frequent exposures cause reactions to a stage where the original depilatory would be materially altered; that often they become valueless and possibly capable of producing harmful effects.

He emphasized as the dominant and characteristic feature of his invention "discovery of the air-restraining and agglutinant or adhesive properties of non-reactive colloids or colloid-like bodies when used with depilating mixtures which enable the same to be prepared in the form of creams, pastes, or jellies; which by virtue of their air-restraining properties maintain the depilating agents from air interaction whereby they are preserved from deterioration, and which by their adhesive or agglutinant properties bring the depilating mixtures into a cream or paste from which permits of its easy application in definite areas with freedom from spreading."

The evidence indicates that the line of distinction between colloids and colloid-like bodies is rather vague, and that the difference is largely one of size. His specified calcined magnesia and its chemical equivalents fall within the term colloid and colloid-like bodies. The language of his specifications and claims is such that colloid-like substances which are air-restraining and nonreactive and agglutin-

ating in character are embraced within the scope of his patent as well as true colloids. He testified as to the advantages of his product; that when finished it can be used without water; is marketable in the collapsible tube; proof against deterioration; remains where it is applied on a vertical surface as well as on a horizontal surface; requires no mixing; is not messy, and can be made of standard strength by incorporating a standardized depilating solution into any direct plasticizing paste; and that the user can always rely upon working with a definite strength in the depilant.

Taking into consideration all that is said in the description, specifications, and claims, and considering the testimony in this record, the court is of the opinion that the patent discloses utility and invention, unless there be something in the prior art that negatives the latter.

The prior art pleaded includes first of all Formula IV of the New Standard Formulary, which suggests a depilatory made from two parts of freshly slaked lime mixed with three parts of water, through which is passed a stream of sulfuretted hydrogen. This is clearly not in accordance with the specifications, description, or claim of Donner. The steps that he suggested as a proper method of achieving a permanent paste have been discussed, and it is apparent from the testimony in the record that the result of this formula is a mass which will decompose and separate into water and residuum. The formula apparently is nothing more than a recipe for the making of calcium sulfhydrate, a long-recognized depilatory. The final magma was produced before the introduction of the depilating agent, whereas Donner inserted the depilating agent into a thin magma, and then developed therefrom by the steps mentioned a permanent finished paste by the introduction of air-restraining colloids or colloid-like substances.

Era Formulary, Formula 2020, does not essentially differ materially from the formula just mentioned. It directs that the manufacturer mix lime and water to a thick cream, and pass through the mixture 25 or 30 times its volume of sulfuretted hydrogen gas. This apparently fulfills the same function as the first step of Donner's process, but it does not cover the ground of his completed achievement. There is no thickening of a thin magma, after the introduction of sulfuretted hydrogen gas, by the introduction of air-restraining bodies of colloid-like character.

The formula of the United States Dis-

pensatory of 1854 is as follows: "This compound is formed by passing sulfuretted hydrogen (hydrogen sulfid $H_2S$) so long as it is absorbed through water holding lime in suspension." Obviously from the wording and the testimony it is apparent that lime in suspension means a mixture which when allowed to stand will settle and separate into liquid and lime residuum, really as described by one witness as "a saturated aqueous solution."

■ The British patent to Lutje is probably the nearest to Donner's achievement. He contemplated the creation of a thin magma and its subsequent formation into a thicker substance by converting the starch into paste. He heated the mixture to the boiling point, stirring it continually so that the starch was converted into paste, and the previously thin magma into thick cream. Prof. Clark, a skilled chemist, made up three different specimens, according to the Lutje patent. In the first sample produced by him he achieved a mixture of roughly three-fourths sedimentation and one-fourth liquid; in the second sample, in which he used arrow-root starch, because, as he said, he considered it one of the finest paste making starches known, he obtained 25 per cent. liquid and 75 per cent. residuum. Fearing that he might not have used sufficient heat in making the first samples, he made a third, which he boiled over a naked flame, and in this the result was approximately the same as in the two others. The samples produced by the defendant's chemists, which have been under observation by the court for several weeks, were not greatly at variance from these of Prof. Clark. Excessive separated liquid appears in some, and unsatisfactory and unconvincing results in all of them. Remembering that an American patent is not anticipated by a prior foreign patent unless the latter exhibits the invention in such full, clear, and exact terms as to enable any person skilled in the art to practice it without the necessity of making experiments [Carson v. American Smelting & Refining Co., 4 F.(2d) 463 (C. C. A. 9)], the court is of the opinion that Lutje does not fulfill the requirements of an anticipation of Donner.

Formula II of the Standard Formulary is part of a number of recipes for depilatories, and at the head of the list appear the words "in using these depilatories they should be made into thin paste with water." Obviously, speaking from the standpoint of Donner's invention, they were unfinished depilatories. Formula II refers to Formula I, which covers powdered depilatories, consisting of polysulfids with inert excipients such as starch, flour, chalk, talc, etc., mixed with water before using. Formula II recites certain proportions of sodium sulfhydrate, slaked lime, starch, and lime water, and directs that "when using it should be applied like the paste formed in the preceding formula." Obviously it was nothing other than the putting into concentrated powder or mass-like substance the previously known depilatories, and then mixing the same at the time of using for the formation of a paste. One working according to this formula would not procure the permanent cream of Donner. The testimony of the witnesses for the defense does not militate against this conclusion.

■ Dr. Joseph's Hand Book of Cosmetics, Formula No. 126, employs calcium hydrosulfid in water, unguent of glycerin, starch, and essence of citron or lemon essence. This publication not having been pleaded prior to the hearing can be considered only for the purpose of ascertaining the status of the art at the time of Donner's invention. Apparently the author was merely suggesting a calcium sulfhydrate suspended, or in solution in water, with all of the defects of other similar formulæ hereinbefore discussed.

The defendant Neet claims a prior use anticipatory of Donner's patent. The president, advertising representative, general manager and superintendent, and one Learmont, to a lesser degree, all testified that Neet has at all times since 1911 been a paste of toothpaste like consistency, and that it had never been in a form of imperfect suspension where the water and residuum would separate. The testimony of one Learmont, a fact witness, is not so strong, but tends in the same direction. It appears, however, that the proportions of lime and other ingredients were changed, and the president testified that defendant Neet's method had taken ten years to develop, and that the compound as made by Neet and its predecessors was that disclosed in the formulæ pleaded in the prior art.

Plaintiff produced a number of disinterested lay witnesses, all of whom testified unequivocally that prior to 1922 Neet, packaged in bottles, was an imperfect compound from which the water arose to the top, and in which the solid ingredients sank to the bottom. These included druggists, who sold the product, housewives, who used it, and a demonstrator for different toilet articles. They testified that from 30 to 50 per cent. was solid and the rest liquid. The plaintiff him-

self testified that he purchased Neet in a drug store in 1919, while working upon his invention, and found that Neet, though described as a cream, was not a plastic paste, but a lotion, an imperfect suspension of solid materials in a fluid, which on standing settled into a solid with a liquid layer on top.

Certain records were produced by Neet on notice from plaintiff, amongst them a letter written on March 23, 1921, by the company to Dr. Kessler, one of its chemists, in which the company stated that it was going to make the material a little thinner, and a second letter by the same writer on March 24th of the same year, that the bottle of Neet which was then received "is exactly what they want; that they have no way of knowing just when this left Hannibal, but since it is thinner than the others they assume it is the new stuff." On March 29th the company wrote Dr. Kessler that certain samples were too dry, and that they are "anxious to have him establish some infallible test to be applied to the product just before bottling it so that it is always of a uniform consistency." On May 20, 1921, the California sales representative wrote to the Neet predecessor saying: "We note there is considerable variation in the amount of liquid in the Neet depilatory bottles." To this the company replied that: "There was formerly a variation in the amount of moisture in Neet, but it has no effect on its working properties. It goes back into a satisfactory paste when stirred with the paddle (referring to the paddle accompanying each bottle). We have installed new machinery so that now Neet is put out in a uniform cream and it holds its cream form, but we do not want to say too much about this because the old Neet was just as positive and correct in its action as the new Neet, and we do not want the retailers to notice the difference, and be asking us to return the old for the new, because we don't do it. * * * This is merely for your information and assurance that we are on the job improving our product at every possible point."

It is difficult to reconcile this contemporaneous statement with the present testimony of the officers of the company. The most kindly indulgence that the court can grant is that in view of the fact that the company has been engaged in the business of manufacture of Neet for a number of years, its officers have forgotten the details of the different stages of the progress made. On the other hand, the statement agrees with the testimony of the lay witnesses, who found Neet prior to 1922 to be an imperfect suspension. The letter above quoted was written May 25, 1921. The patent in suit was applied for March 3, 1921, and issued May 31, 1921.

That the manufacturer of Neet did thicken its thinned mass, after impregnating the same with the depilatory compound in a manner similar to that of Donner, further appears probable from a letter written by the company to its chemist on June 8, 1921, stating that the mass is of such nice consistence that the small amount of granular matter put into it to thicken shows, and asking what he would think of sifting the lime before it is put into the churns as a thickener. In his reply he suggested that the manufacturer run the churns for ten minutes after the thickener "has been added." In April, 1922, Dr. Kessler analyzed a depilatory known as "Eusa" manufactured by parties to whom Donner had shown his methods. On March 14, 1923, the company wrote that one of their employees reported that the hydrate settled down out of suspension more quickly than that formerly supplied, and on March 24th of the same year Dr. Kessler wrote that the difficulty with the lime in this respect probably came from the fact it was not sufficiently light and fluffy. Apparently at that time Neet was being made by injecting the depilatory compound into a thin magma, and then thickening the mass by a fluffy lime, that is, extremely subdivided calcium hydroxid or lime hydrate, thus achieving a suitable paste by the use of Donner's air-restraining, agglutinating colloid or colloid-like substance of a nonreactive character. Light fluffy calcium hydroxid is obviously an equivalent of light calcined magnesia.

One of the testimonials of Neet came from a lady who said on March 6, 1924, that she had used Neet for years; "used it when it came in a bottle and was horrid—used it as it came then in a tube and found it delightful."

The records show also analysis by a chemist of a competing product Pomona, the product Usa, presence of chlorine and sodium chloride in Neet, and the expressed idea of applying for a patent on the process of manufacturing Neet. There are various circumstances corroborating the testimony as to the quality and character of Neet prior to 1922, and supporting the conclusion that a change was made from the method of manufacturing which followed rather closely the prior art, to a new method which follows rather closely the teachings of Donner. This change was made not earlier than the time of the application of Donner, and the conclusion is inevi-

table that the use of Neet prior to Donner's application did not in any way anticipate his teachings, but merely came within the prior art, the teaching of which he recognized. Prior use must be proved beyond a reasonable doubt and by something more than the recollection testimony of witnesses unsupported by contemporaneous records, exhibits, or the like. The Barbed Wire Patent Case, 143 U. S. 275, 12 S. Ct. 443, 36 L. Ed. 154; General Insulating Co. v. Union Fibre Co., 261 F. 389 (C. C. A. 7). The record in this case in this respect substantiates the position of the plaintiff rather than that of the defendant.

■ Defendant introduced the testimony of certain experts who made experiments ex parte. Unfortunately the strict teachings of the formulæ and the Donner Patent were not followed, and there is little to enlighten the court, therefore, in the testimony as to the same. The courts place little weight on ex parte demonstrations in any case, but especially is this true with regard to experiments with chemicals. Kuehmsted v. Farbenfabriken Co., 179 F. 701 (C. C. A. 7). In this connection it is well to note that the chemist, who for years has been familiar with the manufacture of Neet, whose letters are above quoted, and who was in constant touch with the situation, did not testify.

■ The court is of the opinion that the evidence as to the prior art does not satisfy the requirements of anticipation. "The invention or discovery relied upon as a defence, must have been complete, and capable of producing the result sought to be accomplished; and this must be shown by the defendant. The burden of proof rests upon him, and every reasonable doubt should be resolved against him. If the thing were embryotic or inchoate; if it rested in speculation or experiment; if the process pursued for its development had failed to reach the point of consummation, it cannot avail to defeat a patent founded upon a discovery or invention which was completed, while in the other case there was only progress, however near that progress may have approximated to the end in view." Coffin v. Ogden, 18 Wall. (85 U. S.) 120, 124, 21 L. Ed. 821. The prior publications do not contain in themselves such clear, full, and exact descriptions of the inventions as will, without anything more, enable one skilled in the art to practice the invention. Cary et al. v. Lovell Mfg. Co. (C. C.) 31 F. 344; Badische Anilin & Soda Fabrik v. Kalle (C. C.) 94 F. 163; Permutit Co. v. Harvey Lumber Co. (C. C. A. 2) 279 F. 713.

■ Donner taught that by the use of colloids and colloid-like substances having air-restraining, agglutinating, or adhesive properties of a nonreactive character the prior art depilatories could by his methods be put into a permanent, stable homogeneous paste, thus bringing the present situation within such cases as U. S. & Foreign Salamander Felting Co. v. Merrimack Mfg. Co., Fed. Cas. No. 16,-789; A. B. Dick v. Belke & Wagner Co. (C. C.) 86 F. 149; King et al. v. Anderson et al. (C. C.) 90 F. 500, 501; Chadeloid Co. v. Frank S. De Ronde Co. (C. C.) 146 F. 988; and Polygon Products Corp. v. Kant-Rust Products Corp. (D. C.) 291 F. 702. The last-mentioned case refers to colloids and colloid-like substances and is interesting in its discussion of that subject.

The court is of the opinion that Donner's teaching is not anticipated by the prior art; that the presumption of validity is sustained by the evidence; and that each of the claims relied upon, considered from the point of view of the patent as a whole, is valid.

Much that has been said concerning Neet and the prior art directly bears upon the subject of infringement. It is not necessary to repeat the facts leading to the court's conclusion that prior to 1922 Neet did not follow the teachings of Donner, and that prior to said date it achieved only an imperfect suspension of chemical compound in water possessing the desired depilating effects, which, when allowed to stand, would separate into liquid and solid. This compound was made by forming the paste in its final form, and then introducing by bubbling the depilating gas. Donner found that by the use of almost infinitessimally fine colloid-like substances, such as lime and magnesia, he could by forming first a thin magma, then impregnating it with the depilating gas, and thereafter thickening the same with his colloid-like material, produce a paste suitable in form. Apparently to some extent, at least, the manufacturers of Neet became convinced that such method was proper, for, as shown by its letters, it introduced churns, the purpose of which was to mix thoroughly the thickener of finely powdered lime. The records show that new machinery was purchased; that the sales representative in California, prior to the placing of the paste in tubes, found a separation of the liquid and solids; that the defendant Neet wrote that that was true of the old form but not of the new, but that it did not want much said about it because it did not want to have to exchange the old stocks. The product to-day, at a date subsequent to that of the

records heretofore discussed, apparently is a substantially permanent paste. It follows, if not fully, at least partly, the teachings of Donner's patent. From an imperfect suspension of calcium hydroxid in the depilating fluid, which in the end usually came to the top, the ten years' development work of Neet, Inc., apparently about 1922 culminated in its present paste, the bulk of which was produced by thickening in a manner similar to that recommended by Donner. The manufacturer recognized in 1923 that it required the lightest hydrate possible as a thickener, thus corroborating Donner's express statement that the fine colloid-like bodies were necessary to prevent the settling and forming a paste.

The defendant Neet now includes the products resulting from the interaction of slaked lime and hydrogen sulfid, and uses calcium hydroxid, apparently as a thickener. One of defendant's experts admitted on cross-examination that such calcium hydroxid would amount to an air-restraining base, and that it could be colloid-like for the purposes mentioned in the Donner patent. Another of defendant's experts admitted that the hydrate of lime in the form it is in Neet is colloid-like and adhesive, thus agreeing with the expert for the plaintiff that the excess calcium hydroxid in Neet is an air-restraining base such as is mentioned by Donner. Lime, as used by Neet, is an equivalent of magnesia specified in the patent. The court is of the opinion that Neet infringes each of the claims relied upon.

The product Odo-Ro-No used as a depilating agent barium sulfid or a compound thereof. Barium sulfid responds chemically in consistency, identity of function, and characteristics to the products of hydrogen sulfid and slaked lime. Donner so recognized it when he said that the sulfid depilatories commonly in use consisted of the sulfids, polysulfids, and sulfhydrates of the alkali, alkaline earth, and earth metals, in solution or suspension. Barium is an alkaline earth metal. The adhesive or carrying vehicle in Odo-Ro-No is barium sulfate, and the same responds to the colloid or colloid-like substances specified by Donner, for barium sulfate is an air-restraining colloid-like substance. Defendant's expert testified that barium sulfate is not colloid in character, but that there might be some traces thereof, and that it might be put in colloidal state, and that the same in Odo-Ro-No is not substantially in colloidal form because it is a commercial barium sulfate. However, upon cross-examination he stated that he had taken it for granted that the barium sulfate used was a commercial form; that he had no personal knowledge of that fact. He admitted that if sufficient finely powdered barium sulfid were added to a thin magma the depilatory would take the substantial form of a cream or paste; that it would be marketable, last a reasonable length of time, and be usable. Odo-Ro-No clearly infringes claims 1, 2, 3, 6, 7, 9, 13, 14, 16, and 17.

X-Bazin contains barium sulfid or a compound thereof, as the depilating agent, and in that respect is similar to Odo-Ro-No. The colloid or colloid-like carrying agent is found to be calcium carbonate, which the testimony shows would function as a colloidal agglutinant and as an air-restraining nonreactive colloidal substance. It clearly responds to claims 1, 2, 3, 6, 7, 9, 13, 14, 16, and 17 of the patent in suit, and similar to Odo-Ro-No contains identical or fully equivalent ingredients compounded to produce the same permanent depilatory paste as that of Donner. The facts bring the case within the doctrine of such cases as Atlantic Giant-Powder Co. v. Mowbray et al., Fed. Cas. No. 624; American Sulfite Pulp Co. v. Howland Falls Pulp Co. (C. C. A.) 80 F. 395; Chadeloid Co. v. Frank S. De Ronde Co. (C. C.) 146 F. 988.

The court does not find in the record sufficient evidence to sustain the defense of laches upon the part of the plaintiff pleaded by Neet, Inc. The plaintiff first complained to Neet, Inc., on August 22, 1922, charging infringement of the patent. At that time Neet claimed it had always been making a paste product. Some correspondence ensued between counsel during the fall and winter of 1922. In 1925 the present counsel for plaintiff again called the attention of the manufacturer of Neet to the alleged infringement. The company claimed to be following the formulæ relied upon in the present case. Donner stated that the early formulæ did not contain the teachings of his patent and offered to make a license agreement. The present suit was filed in July, 1928, and thereafter Neet became a party defendant. Donner was a government employee on a small salary, and took no aggressive action until filing the suit. There is no element sufficient to constitute laches in this situation. Plaintiff did nothing which misled Neet, Inc., and nothing to create an equitable estoppel against himself. Beginning with 1922 he never made any statement other than to the effect that he considered Neet infringing. There were no acts or lack of action upon Donner's part whereby he intentionally or recklessly induced Neet

to be misled to its prejudice. In the absence of such showing, the defense of laches is not sustained. Stearns-Roger Mfg. Co. v. Brown (C. C. A.) 114 F. 939; Menendez v. Holt, 128 U. S. 514, 9 S. Ct. 143, 32 L. Ed. 526; Ide v. Trorlicht et al. (C. C. A.) 115 F. 137; Davis v. A. H. Reid Creamery & Dairy Supply Co. (C. C.) 187 F. 157; Columbia Graphophone Co. v. Searchlight Horn Co. (C. C. A.) 236 F. 135; Drum v. Turner (C. C. A.) 219 F. 188; Edison Electric Light Co. v. Sawyer-Man Electric Co. (C. C. A.) 53 F. 592.

The court is of the opinion that the prior art does not in any way anticipate or in any degree limit the invention of the patent in suit; that it merely establishes what Donner recognized as the prior art in his specifications; that the product of Neet, Inc., and its predecessors prior to 1922 was an impermanent mixture made according to the disclosure of the early prior art, but in no way or respect anticipating the Donner patent; that the patent in suit is valid and covers a meritorious invention which has advanced the art; that it is infringed by each of the products Neet, Odo-Ro-No, and X-Bazin; that the defense of laches is not sustained; and that the plaintiff is entitled to a decree accordingly.