**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CARLA M. DULANEY,

        *Plaintiff-Appellant,*

v.

PACKAGING CORPORATION OF
AMERICA; BOBBY MILLS,

        *Defendants-Appellees.*

No. 10-2316

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

    *Amicus Supporting Appellant.*

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
James C. Turk, Senior District Judge.
(7:09-cv-00063-jct)

Argued: January 25, 2012

Decided: March 12, 2012

Before DUNCAN, DAVIS, and KEENAN, Circuit Judges.

Vacated and remanded by published opinion. Judge Duncan
wrote the opinion, in which Judge Davis and Judge Keenan
joined.

## COUNSEL

**ARGUED:** Terry Neill Grimes, GRIMES & WILLIAMS, P.C., Roanoke, Virginia, for Appellant. Anne Noel Occhialino, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Supporting Appellant. Lawrence Philip Postol, SEYFARTH SHAW, LLP, Washington, D.C., for Appellees. **ON BRIEF:** Kevin D. Holden, JACKSON LEWIS LLP, Richmond, Virginia, for Appellee Bobby Mills. P. David Lopez, General Counsel, Lorraine C. Davis, Acting Associate General Counsel, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Supporting Appellant.

## OPINION

DUNCAN, Circuit Judge:

This appeal arises out of the district court's grant of summary judgment in favor of Packaging Corporation of America ("PCA") on appellant Carla Dulaney's claims of sexual harassment in violation of Title VII. Finding genuine questions of material fact in dispute, we vacate and remand.

### I.

### A.

In considering the grant of a motion for summary judgment, we view facts and inferences drawn from them in the light most favorable to the non-moving party. *Pueschel v. Peters*, 577 F.3d 558, 563 (4th Cir. 2009). We therefore recite the facts here as Dulaney alleges them and note areas of disagreement only where essential to our analysis.[1]

_____

[1]For this reason, we assume that the relationship between Bobby Mills and Dulaney was nonconsensual although Mills apparently contends oth-

PCA is a manufacturer of cardboard boxes headquartered near Chicago. Dulaney worked as a "Class 'B' Glue Helper" on the second shift at PCA's Roanoke, Virginia facility. In that capacity, she was one component of a production line that depended on the efficiency of all to assemble boxes.

Approximately 50 hourly and 15 to 20 salaried employees, most of them male, worked at the Roanoke plant. These employees worked in multiple shifts. After the close of regular business hours, which occurred during the middle of Dulaney's shift, there was no employee on duty with the title of "manager" or "supervisor." Instead, Bobby Mills was designated as a "lead production worker." Appellee's Br. 6. Although lacking a supervisory title, Mills nevertheless exercised certain responsibilities with respect to other workers. For instance, he had the authority to assign work, send employees home early without pay, and assess them points pursuant to PCA's progressive discipline system—under which any employee earning 12 points was subject to automatic termination. Mills was also responsible for reporting employee complaints and misconduct to management. He had a key to the office area, which allowed him sole access to that part of the plant after the close of business.

Dulaney began working for PCA as a temporary hourly employee in June 2006. PCA's customary practice was to offer temporary employees permanent employment after they had worked a certain number of hours. Dulaney, however, was not offered permanent employment on this schedule. Rather, she had discussions with Mills throughout the fall of

erwise. PCA spends much of its brief attempting to undermine Dulaney's credibility as to her allegations of harassment by discussing affidavits from her former co-workers in which they claim that Dulaney told them about "her formerly working as a stripper and escort." Appellee's Br. 7. In addition to being of questionable relevance to the underlying issue of whether Mills sexually harassed Dulaney during her employment at PCA, such references are, in the context of deciding a motion for summary judgment, unhelpful.

2006 as to when she might be promoted. Mills, although nominally only lead production worker, ultimately wrote a memorandum extending her an offer of permanent employment on November 20, 2006.

Shortly thereafter, in December 2006, Mills approached Dulaney about "taking care of him" by performing sexual acts. J.A. 26. She initially refused, at which point, she claims, Mills followed through on threats to make her life "hell" by screaming at her, spreading rumors, and otherwise interfering with her work if she continued to refuse. Appellant's Br. 6. She eventually acceded to his demands.

These encounters typically occurred in the men's restroom or the office area, where Mills knew he would not be disturbed because he alone had the key. Mills often interrupted Dulaney's work by calling her away from her station to report to the office for the purpose of engaging in sexual relations with him. At other times, he would rub himself against her while she was working at her machine to signal that he wanted her to engage in sex. Dulaney claims that Mills would often scream at her when she refused him.[2] Mills also sent Dulaney home early, with a corresponding loss of pay, on more than one occasion.

At some point, Mills began making sexually explicit comments about Dulaney to her co-workers. For example, he spread a rumor that Dulaney had a sexually transmitted infec-

---

[2]The reports of other PCA employees about the relationship between Mills and Dulaney are conflicting. An affidavit from former PCA employee Floyd Joyce states: "Bobby Mills, a supervisor, harassed Carla Dulaney 24/7. He stalked her a lot to the point she would start crying." J.A. 201. On the other hand, current PCA employees Cedric Preston and Jane Vars submitted affidavits stating that Dulaney bragged about having a consensual affair with Mills. J.A. 163, 166.

tion. Dulaney contended that this and other rumors caused other employees to treat her poorly.[3]

Dulaney complained about Mills's derogatory remarks to his direct supervisor, Mike Bourne. Bourne responded to this complaint by reminding Dulaney that she was "replaceable." J.A. 48. Dulaney complained to Bourne on one other occasion. In early 2007, she had a dispute with Jane Vars, another employee at the plant. Vars had called Dulaney a "nigger lover" and spread rumors similar to the one just described. J.A. 248. Bourne "laughed it off." J.A. 247. When Dulaney and Vars expressed their intent to take their dispute to a more senior supervisor, Donnie Woodward, Bourne threatened to fire them if they went over his head.

Matters reached a crisis point on September 26, 2007. An African American employee, Tim Divers, whose work Dulaney assisted, complained to Woodward about Mills's treatment of Dulaney. Earlier that day, Mills had been screaming at Dulaney, saying that she was a "whore" and "replaceable," and demanding to know whether she was "fucking these niggers here." J.A. 250. Dulaney was one of the few white employees at the plant. Divers complained that he was unable to perform his work efficiently when Dulaney was away from her station or crying, as was often the case. Following up, Dulaney went to Woodward's office to report Mills's conduct. Because Woodward was unavailable, Dulaney spoke to his secretary.

Woodward called Dulaney into his office to discuss Mills on September 28, 2007. Dulaney, Woodward, and Mills disagree about what happened next. Dulaney testified that Woodward initially sent her to finish her shift with Mills and that Bourne approached her and said "can't you two just get along." J.A. 269. According to Dulaney, Woodward sent her

---

[3]Preston also testified that Mills told him that Dulaney "had a nasty disease" and that he did not want her socializing with other men. J.A. 443.

home with pay once he realized that she would have to finish her shift alongside Mills. Woodward, on the other hand, testified that Dulaney was allowed to go home because she was upset, that Bourne escorted her off the premises, and that he planned to schedule her for the first shift so that she could avoid Mills. Woodward further testified that Mills finished his shift on September 28 but resigned on the next business day, October 1.

Mills tells a still different version. He claims that he finished his shift on September 28, after Woodward told him that Dulaney reported him, and came back to work on October 1. Mills maintains that he took a vacation day on October 2, returned to work for a meeting on October 3, and then continued to use his vacation time until PCA fired him on October 7.

Woodward contacted Greg Bright in PCA's Human Resources department on October 1, 2007 to arrange for Dulaney to submit a written complaint. Bright interviewed Dulaney on October 3 and sent her home early with pay after she became upset.

Dulaney's relationship with her co-workers and Bourne deteriorated after this point. She had two further disputes with Vars, the first of which involved Vars passing messages from Mills to Dulaney, and the second of which involved Vars calling Dulaney a "whore" and accusing her of being promiscuous. Although Vars was reprimanded in connection with these disputes, Dulaney testified that when she complained about these disputes to Bourne, he and Vars laughed at her, saying "[t]here goes Carla again." J.A. 51. PCA did not reprimand Dulaney for these disputes.

Dulaney approached Bright on November 2, 2007 to discuss her desire to find a new job because her co-workers continued to ostracize her. She found it difficult to search for a new job while working full-time for PCA. Bright proposed a

severance agreement and arranged for one to be prepared for her to review. Critical to this appeal, an internal PCA memorandum about Dulaney explains "[w]hen the separation agreement is prepared . . . payroll automatically stops the employee's pay as of the *termination date* stated in the agreement . . . Payroll coding is as follows: Employment status is 'terminated' . . . Termination Reason should be completed as Quit with Notice." J.A. 187. The agreement stated that Dulaney's "employment with [PCA] shall be terminated effective November 2, 2007." J.A. 181. Consistent with the internal memorandum and the severance agreement, we presume that PCA ceased paying Dulaney on November 2. Dulaney did not meet with Bourne and Bright to receive a copy of the severance agreement until November 5.

The letter accompanying the severance agreement that PCA presented to Dulaney on November 5 explained that she had 21 days to sign the severance agreement and seven days after signing to revoke it. The letter also informed her that she had the right to consult with an attorney to review the document prior to signing. The severance agreement itself proposed an extensive waiver of rights in exchange for weekly payments and benefits until December 31, 2007.

Dulaney testified that at the November 5 meeting, Bright told her that she was required to sign the severance agreement before she left the office that day or she would be fired. When she refused to sign, Bourne escorted her out of the office and told her to take her belongings and lock from her locker. Bourne then took her key to the facility and asked her when she would be able to return her uniform.

Dulaney returned her uniform on November 7, 2007 and refused, on her lawyer's advice, to speak to management. That same day, Bright wrote Dulaney a letter explaining that she still had not been fired and was welcome to return to work. Nonetheless, in Dulaney's unemployment hearing on

November 29, 2007, PCA described her status as "terminated."

B.

On February 27, 2009, Dulaney sued PCA and Mills for gender discrimination and sexual harassment, in violation of Title VII of the Civil Rights Act of 1965, 42 U.S.C. §§ 2000e, *et seq*., and for state law causes of action, in the United States District Court for the Western District of Virginia. She sought to hold PCA and Mills jointly and severally liable for compensatory and punitive damages. PCA filed for summary judgment on July 13, 2010. The district court granted PCA's motion on November 15, 2010.

In reaching its decision, the district court relied on the affirmative defense recognized by the Supreme Court in *Faragher v. Boca Raton*, 524 U.S. 775 (1998), and *Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998). Ordinarily, an employer would be liable under the doctrine of respondeat superior if a victim's supervisor created a hostile work environment or sexually harassed the victim himself. If the employer took no tangible employment action against the victim, the *Faragher-Elleth* doctrine provides a defense to the charge of supervisory harassment if: (1) the employer "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765.

The district court made somewhat contradictory factual statements in analyzing the availability of the defense. At one point, it noted that "[t]here is no allegation here that Dulaney's direct employer, PCA, sexually harassed her. Instead, Dulaney alleges that a co-worker harassed her." *Dulaney v. Packaging Corp. of Am.*, No. 7:09-cv-00063 2010 U.S. Dist. LEXIS 120687, at *8 (W. D. Va. Nov. 15, 2010).

The district court later notes, however, that it need not decide whether Mills was a supervisor before assessing whether PCA was entitled to assert the *Faragher-Ellerth* defense. *Id.* at *1 n.1, *6 n.4. Although we find this apparent confusion difficult to parse, we believe that the district court was trying to give Dulaney the benefit of the doubt by holding PCA to the relatively strict standard imposed by respondeat superior. In other words, the district court reasoned that if it assumed that Mills was a supervisor, and if PCA was nonetheless entitled to the *Faragher-Ellerth* defense, then Dulaney could not prevail on any Title VII claim.

In considering whether PCA was entitled to the *Faragher-Ellerth* defense as a matter of law, the district court first considered whether PCA had taken a "tangible employment action" against Dulaney. It rejected her argument that (1) being sent home with points for refusing sexual advances, (2) being escorted off the premises on November 5, 2007, and (3) being labeled as "terminated" on an internal PCA memorandum were evidence of a "tangible employment action." Instead, it relied solely on the terms of the severance agreement—which explained that Dulaney had 21 days to consult with an attorney before executing it—as proof that PCA had not fired or taken any other tangible employment action against Dulaney. It further noted that even if Dulaney reasonably interpreted the events that transpired during the November 5 meeting as her termination, PCA's subsequent letter explaining that she had not been fired, proved that "there is no genuine issue of material fact as to whether Dulaney suffered a 'tangible employment action.'" *Id.* In a footnote the district court commented: "While the 'legalese' of the severance agreement may not have been clear to Dulaney herself, it would have been abundantly clear to an attorney, which PCA advised she could have consulted before signing the agreement." *Id.*, at *12 n.3.

Having determined that PCA took no tangible employment action against Dulaney, the district court then concluded that

PCA had proven both prongs of the *Faragher-Ellerth* defense: it found that PCA exercised reasonable care to prevent and correct promptly any sexually harassing behavior,[4] and that Dulaney unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.[5] Accordingly, the district court entered summary judgment in favor of PCA on Dulaney's federal claims. Having dismissed all of Dulaney's federal claims, the district court declined to exercise supplemental jurisdiction over her state law claims and dismissed them without prejudice.

## II.

Dulaney appeals the district court's entry of summary judgment in favor of PCA.[6] She argues that the district court erred

---

[4]The district court reached this conclusion by following our decision in *Howard v. Winter*, 446 F.3d 559, 571 (4th Cir. 2006), reasoning that "an employer will be deemed to have exercised reasonable care to correct sexually harassing behavior when an employer's remedial response results in the cessation of the complained conduct." *Dulaney*, 2010 U.S. Dist. LEXIS 120687, at *14-15 (quotation marks omitted). The district court dismissed the conflict in narratives of when Mills stopped working for PCA and stated simply that "the day that Dulaney discussed the matter with PCA management was the last day that Mills ever worked at the PCA plant." *Id.* at *15.

[5]The district court found that although Dulaney claimed to have reported some of Mills's harassment to Bourne, she had failed to seek redress under PCA's sexual harassment policy because that policy required her to report any sexual harassment to the Facilities Manager or Human Resources. *Id.* at *16-17. It found Bourne's threat to fire Dulaney if she went over his head to be a "generalized fear of retaliation" insufficient to excuse her failure to report the harassment according to PCA's policies. *Id.* at *18. We express no opinion about the appropriateness of this analysis since we find that summary judgment is inappropriate in light of other genuine questions of fact.

[6]The EEOC has filed a brief as amicus curiae in support of Dulaney. It joins her in arguing that the district court erred by not determining whether Mills was a supervisor and by concluding that there was no genuine issue of fact as to whether Dulaney had suffered a tangible employment action.

first by not determining whether Mills was her supervisor before applying the *Faragher-Ellerth* defense, then by finding that PCA took no tangible employment action against her, and finally by improperly overlooking genuine issues of fact when it applied the *Faragher-Ellerth* defense. PCA argues first that it took no tangible employment action against Dulaney and second, even if it did, that the *Faragher-Ellerth* defense should nonetheless apply because the alleged harasser had no hand in the tangible employment action.

Turning first to Dulaney's arguments, because we find that there are genuine issues of fact as to whether PCA took "tangible employment action" against Dulaney, we reach neither the question of whether the district court erred by not determining whether Mills was a supervisor nor the question of whether the district court correctly applied the *Faragher-Ellerth* defense itself. Turning then to PCA's arguments, we

---

In particular, the EEOC urges us to analyze this appeal as a "submission case," that is, one in which an employee submits to sexual abuse in order to retain his or her job. The EEOC's Enforcement Guidance explains that "[i]f a supervisor undertakes or recommends a tangible job action based on a subordinate's response to unwelcome sexual demands, the employer is liable and cannot raise the [*Faragher-Ellerth*] defense. The result is the same whether the employee rejects the demands and is subjected to an adverse tangible employment action or submits to the demands and consequently obtains a tangible job benefit. Such harassment previously would have been characterized as 'quid pro quo.'" Although not controlling, the EEOC's Enforcement Guidance does "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). The Second and Ninth Circuits have found the EEOC's Enforcement Guidance persuasive. *Min Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 95 (2d Cir. 2001); *Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1172. (9th Cir. 2003).

PCA argues that Dulaney has waived this argument because she did not pursue this submission theory of liability in the district court. We need not resolve this issue, however, because we find that summary judgment was inappropriate because of the disputed issues of material fact surrounding Dulaney's termination.

explain why PCA's contention that it is entitled to the *Faragher-Ellerth* defense even if it fired Dulaney is meritless, provided that there is some nexus between the harassment and her eventual firing.

We review a district court's decision to grant summary judgment de novo, applying the same legal standards as the district court and viewing all facts and reasonable inferences in the light most favorable to the non-moving party. *Pueschel*, 577 F.3d at 563. Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the non-moving party. *Newport News Holdings Corp. v. Virtual City Vision*, 650 F.3d 423, 434 (4th Cir. 2011); *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996).

### A.

We begin our analysis with Dulaney's argument that the district court overlooked genuine questions of fact when it determined that PCA was entitled to the *Faragher-Ellerth* defense as a matter of law.[7] Before reaching the defense,

---

[7] Dulaney and the EEOC argue that the district court erred by not determining as an initial matter whether Mills was her supervisor because different standards apply when the alleged harasser is a supervisor instead of a co-worker. We have previously explained that when the harasser is a supervisor, the employer is presumptively liable under the doctrine of respondeat superior, unless the *Faragher-Ellerth* defense applies. *Whitten v. Fred's, Inc.*, 601 F.3d 231, 243 (4th Cir. 2010). However, when the harasser is not a supervisor, the employer is not liable unless "the employer itself was negligent in failing to take effective action to stop harassment about which it knew or should have known." *Id.* As discussed above, we read the district court's opinion as attempting to give Dulaney

courts must first determine whether the company took a tangible employment action against the employee. The defense is unavailable if the employer has done so. *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807-08. We therefore begin with the threshold question of whether Dulaney suffered a tangible employment action.

In *Ellerth*, the Supreme Court defined a "tangible employment action" as "a significant change in employment status,

the benefit of the more stringent standard by assuming that Mills was her supervisor. Unfortunately, it is unclear whether the district court in fact assumed that Mills was her supervisor in conducting its analysis. For example, the district court twice says that it is not deciding whether Mills was Dulaney's supervisor. *Dulaney*, 2010 U.S. Dist. LEXIS 120687 at *3 n.1, *18 n.4. Then, when describing Dulaney's federal claims, the district court says that she "alleges that a co-worker harassed her." *Id.* at *8. This is incorrect. Dulaney alleged that "Bobby Mills, [her] supervisor, told [her] that she had to provide sexual favors to him to make things easy for her at work and to keep her job." J.A. 11.

We are concerned that this apparent uncertainty about whether Mills was a supervisor tainted the district court's analysis of whether Dulaney suffered a tangible employment action by making various events during her tenure at PCA seem unduly innocuous. For example, if one co-worker repeatedly tells another co-worker to clock out early, but lacks the authority to enforce such instruction, it is, of course, difficult to argue that there has been an "employment action" since no agent of the employer has authorized this action. On the other hand, if a supervisor repeatedly tells another employee to clock out early, thereby effectively cutting the employee's wages, our analysis might be different. *See Ellerth*, 524 U.S. at 762 ("A tangible employment action in most cases inflicts direct economic harm. As a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury."); *see also Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006) ("A reduction in an employee's hours, which reduces the employee's take-home pay, qualifies as a tangible employment action."). Given Mills's control over Dulaney's day-to-day activities—such as his apparent authority to send her home early—we would have difficulty believing that he was not her supervisor under the framework we laid out in *Whitten*, 601 F.3d at 244-45. Accordingly, we think it is for the jury to decide whether he was her supervisor and whether any of his interactions with Dulaney constitute a tangible employment action.

such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." 524 U.S. at 761. We find that there is a genuine issue of fact as to whether Dulaney was fired. The district court erred by giving dispositive weight to the language of the severance agreement and Bright's letter without considering the contradictory evidence in the record. We also conclude that the district court did not properly draw inferences in favor of Dulaney as the non-moving party.

The district court reasoned that "[w]hile the 'legalese' of the severance agreement may not have been clear to Dulaney herself, it would have been abundantly clear to an attorney, which PCA advised she could have consulted before signing the agreement." *Dulaney*, 2010 U.S. Dist. LEXIS 120687 at *12 n.3. Dulaney, of course, did consult an attorney, then refused to sign the agreement, and instead filed this lawsuit. Dulaney, through her attorney, indeed argues that the language of the agreement specifies that she was terminated, and further contends that the circumstances surrounding the receipt of the agreement indicate that she had been terminated. Appellant's Br. 33. In other words, Dulaney and her attorney read the agreement as an offer of severance benefits in exchange for a waiver of certain rights, such as the right to file suit in any jurisdiction except Illinois; the alternative to this offer, as they read it, was termination. We do not find such an interpretation so unreasonable that it warrants rejection as a matter of law.

The district court treated Bright's letter, in which he claimed that Dulaney was welcome to return to PCA, as dispositive evidence that Dulaney was not fired. The district court explained that "[e]ven if it were reasonable for Dulaney to get the impression on November 5 that she had been fired, that impression was quelled by PCA's letter explicitly stating that Dulaney *had not* been fired and, in fact, still had her position at PCA if she so desired." *Dulaney*, 2010 U.S. Dist. LEXIS 120687 at *12. Bright's letter, however, does not

stand in isolation. *See Evans*, 80 F.3d at 959 (explaining that the question on summary judgment is whether any reasonable jury "reviewing the record as a whole" could enter a verdict for the non-moving party). According to Dulaney, whose testimony we must credit on summary judgment, Bright informed her that she would be fired if she did not sign the severance agreement. After she refused to do so, Bourne walked her to her locker, directed her to gather her lock and other belongings, took her key to the facility, then escorted her off the premises. Further, according to an internal memorandum, PCA stopped Dulaney's payroll as of November 2, three days before Dulaney first saw the severance agreement. It would not be unreasonable for a jury to conclude, based upon this fact, that Dulaney had been terminated regardless of whether or not she signed the agreement. By providing dispositive weight to individual documents without considering circumstances, such as those described above, the district court effectively drew inferences in favor of the wrong party.

We emphasize that on summary judgment, we consider "all facts and reasonable inferences in the light most favorable to the non-moving party." *Pueschel*, 577 F.3d at 563. Drawing reasonable inferences in Dulaney's favor, we cannot say that no reasonable jury, looking at the totality of the events that form this dispute, would find that she had been terminated. Accordingly, we hold that summary judgment is inappropriate for this case because there is a genuine issue of fact as to whether PCA took a tangible employment action against Dulaney.

### B.

PCA argues that, even if it took a tangible employment action against Dulaney by firing her, it is entitled to the *Faragher-Ellerth* defense "[b]ecause Dulaney's employment did not end at the hands of Mills, the alleged harasser." Appellee's Br. 28. In support of this argument, PCA directs us to our decision in *Brown v. Perry*, 184 F.3d 388 (4th Cir.

1999), in which we allowed an employer to assert the *Faragher-Ellerth* defense where the record demonstrated "that Brown suffered no tangible employment action at [the harasser's] hands" and the alleged harasser "took no part in any decision to hire, fire, discharge, transfer, or reassign Brown, or in any way to alter her employment benefits. Indeed, the only tangible employment action taken with regard to Brown during the relevant period was her promotion." *Id.* at 395.

PCA overreads *Brown*. *Brown* did not depart from the relevant inquiry in this circuit, which requires us to look at the entire course of conduct between the harassment and the tangible employment action. For example, in *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371 (4th Cir. 2004), we explained that a poor performance evaluation "merely causing a loss of prestige or status is not actionable." *Id.* at 377. However, if the employer later used that evaluation as a basis for demotion, firing, or other tangible employment action, the discriminatory evaluation would become actionable. *Id.* This analysis recognizes that the harasser may use his or her discriminatory intent to set in motion a tangible employment action taken by someone else. That someone other than the harasser takes the tangible employment action does not change its but-for cause: discrimination in violation of Title VII. *See id.*

We read *Brown* as requiring some nexus between the harassment and the tangible employment action for the latter to be actionable. *Cf. Lissau v. Southern Food Serv.*, 159 F. 3d 177, 182 (4th Cir. 1998) ("Tangible employment actions, if not taken for discriminatory reasons, do not vitiate the affirmative defense."). In *Brown*, the victim was promoted for reasons unrelated to the harassment, 184 F.3d at 395, and therefore there was no nexus between the harassment and the tangible employment action for Title VII purposes. Viewing the facts of this case in the light most favorable to Dulaney, we cannot say the same is true here. Inconsistencies between

stories about how PCA reacted to Dulaney's allegations began the day she reported the harassment. Furthermore, there is testimony that Bourne, the supervisor who escorted her from the premises on November 5, criticized and laughed at Dulaney first when she reported that Mills was making inappropriate sexual comments about her to her co-workers, again when she reported Mills's physical harassment, and again when she reported that some co-workers continued to tease her about the sex-themed rumors initiated by Mills. Bourne's treatment of Dulaney as she sought to report Mills's sexual harassment and his subsequent involvement in her termination suggest a nexus between Mills's harassment and her termination. Such questions are for the jury to decide. Simply put, we find sufficient uncertainty in the facts about what transpired between September 26 and November 7—uncertainty about whether there is a nexus between the harassment and Dulaney's alleged termination—to find summary judgment inappropriate.[8]

## III.

For the foregoing reasons, the judgment of the district court is

*VACATED AND REMANDED*.

---

[8]Because we find that there is a genuine question of fact as to whether Dulaney was terminated, we express no opinion about whether she experienced a tangible employment action when she was sent home without pay or awarded points under PCA's progressive discipline system.