**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-1395**

COVOL FUELS NO. 4, LLC, a Utah limited liability company,

        Plaintiff – Appellant,

    v.

PINNACLE MINING COMPANY, LLC, a Delaware limited liability company,

        Defendant – Appellee.

Appeal from the United States District Court for the Southern District of West Virginia, at Beckley.  Irene C. Berger, District Judge.  (5:12-cv-04138)

Argued: January 28, 2015           Decided: March 3, 2015

Before KING and FLOYD, Circuit Judges, and DAVIS, Senior Circuit Judge.

Affirmed in part, vacated in part, and remanded by published opinion.  Judge King wrote the majority opinion, in which Senior Judge Davis joined.  Judge Floyd wrote a separate opinion dissenting in part and concurring in part.

**ARGUED:** Thomas Vincent Flaherty, FLAHERTY SENSABAUGH BONASSO PLLC, Charleston, West Virginia, for Appellant.  Timothy J. Downing, ULMER & BERNE LLP, Cleveland, Ohio, for Appellee.  **ON BRIEF:** Alan L. Sullivan, James D. Gardner, SNELL & WILMER L.L.P., Salt Lake City, Utah, for Appellant.  Wm. Scott Wickline, Christopher D. Pence, HARDY PENCE PLLC, Charleston, West Virginia; Joseph A. Castrodale, Paul R. Harris, Matthew T. Wholey, ULMER & BERNE LLP, Cleveland, Ohio, for Appellee.

KING, Circuit Judge:

From 2008 to 2011, Covol Fuels No. 4, LLC ("Covol") and Pinnacle Mining Co., LLC ("Pinnacle") were parties to a business agreement wherein Covol conducted coal fines recovery operations at Pinnacle's mine in Wyoming County, West Virginia (the "Pinnacle mine"). After it became economically unfeasible for Covol to continue those recovery operations, it initiated this civil action in the Southern District of West Virginia, alleging claims for breach of contract, tort, and unjust enrichment. Pinnacle moved for summary judgment, which was awarded as to all claims. See Covol Fuels No. 4, LLC v. Pinnacle Mining Co., LLC, 14 F. Supp. 3d 724 (S.D. W. Va. 2014) (the "Opinion").[1] Covol has appealed the district court's award of summary judgment on its contract and tort claims. As explained below, there are genuine issues of material fact that must be resolved with respect to Covol's breach of contract claim. On the other hand, we agree with the Opinion that Covol's tort claims are barred by the so-called "gist of the action doctrine." We therefore affirm in part, vacate in part, and remand.

---

[1] The Opinion is found at J.A. 2861-90. (Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

I.

A.

The Pinnacle mine includes several stages of operations through which coal is recovered, beginning with mining coal from the Pocahontas Number 3 seam.[2] That extracted material goes through Pinnacle's "wash" or "prep" plant (the "wash plant"), which strips coal from waste (the "refuse material"). Pinnacle then pumps the refuse material through a slurry line and into its nearby Smith Branch impoundment (the "impoundment").

The impoundment is a ten-acre, man-made pond created by a dam on the downstream side of the impoundment, on the Smith Branch of Pinnacle Creek, near Pineville, West Virginia. It measures 200-feet deep at the greatest depth, runs nearly a mile in length, and is between 500- and 1000-feet across. The refuse material settles into the impoundment, which is filled with water. Pinnacle is able to pump water out of the impoundment and into a so-called "toe pond" downstream. From there, the water may either be pumped into an underground reservoir (and then back into Pinnacle's wash plant) or released, where it flows into Pinnacle Creek, the Guyandotte River, and,

_____

[2] We recite the facts in the light most favorable to Covol, as the nonmoving party. See Durham v. Horner, 690 F.3d 183, 185 n.3 (4th Cir. 2012).

3

eventually, to the Ohio River, the Mississippi River, and the Gulf of Mexico.

The refuse material contains fine-grained coal ("coal fines") not captured by the wash plant. If refuse material is lifted from the impoundment, it can be processed to extract those coal fines, which can be sold for various industrial purposes.[3] In October 2006, Beard Pinnacle, LLC ("Beard") initiated coal fines recovery operations at the Pinnacle mine, wherein it dredged the impoundment for refuse material, which it processed at an adjacent facility (the "processing facility").

B.

1.

In February 2008, Covol executed a series of contracts with various Pinnacle affiliates, whereby Covol took over Beard's operations.[4] The principal contract at issue is the Coal

---

[3] The coal fines in the impoundment are apparently of substantial value, having been extracted from the Pocahontas Number 3 seam, which contains some of the best coal in the world. See C. Stuart McGehee, Pocahontas No. 3 Coal Seam, W. Va. Encyclopedia (Oct. 22, 2010), http://www.wvencyclopedia.org/articles/1880. See also Castner v. Coffman, 178 U.S. 168, 173 (1900) (observing that coal from the Pocahontas Number 3 seam has been "well and favorably known as a coal of high grade").

[4] Through a series of related agreements, Covol purchased the processing facility and its assets from Beard; Covol assumed a lease from Beard Technologies, Inc., in order to operate the processing facility; and Covol and Pinnacle agreed on a manner for splitting the profits from the processed coal fines.

4

Purchase and Refuse Recovery Agreement (the "Agreement").[5]  The Agreement — a fully integrated contract — was executed on February 15, 2008, and imposed a five-year term, with the option for the parties to mutually agree to renew for additional one-year terms.  Covol was authorized to unilaterally terminate the contract under section 12 of the Agreement if its operations became economically unfeasible.  The Agreement designates that it shall be governed by West Virginia law.  See Agreement § 27.

Pursuant to the Agreement, Covol agreed to purchase and process "all or part of" the refuse material located in the impoundment, and to handle and process that material "in such a way which does not interfere with Pinnacle's Mining Operations." See Agreement § 4.  Pinnacle disclaimed any representation or warranty as to the "character or quality or amount of the Refuse Material Covol removes or receives."  Id. § 20.  Pursuant to section 18 of the Agreement, Pinnacle was required to provide Covol with:  an area near the impoundment where Covol could install and maintain its equipment; ingress and egress across Pinnacle's property; and "any right-of-way reasonably needed" for Covol to "transport the Refuse Material from the

_____

[5] The Agreement is located at J.A. 75-92.

5

[impoundment] to the processing [facility]."[6]  Two provisions of the Agreement — sections 7 and 8 — imposed contractual duties relating to applicable laws.  Section 7 required Covol and Pinnacle, in performing their obligations under the Agreement, to "comply in all respects with and undertake all responsibilities under" applicable state and federal laws.[7]  Relatedly, section 8 required the parties to obtain and maintain any necessary permits or licenses.[8]

---

[6] Section 18 of the Agreement, which is titled "Access and Lease Provisions," provides, in pertinent part:

> Pinnacle shall provide to Covol:  (i) a mutually agreeable area . . . to install and maintain its Processing Facility . . . ; (ii) any right-of-way reasonably needed by Covol to transport the Refuse Material from the [impoundment] to the processing [facility]; and (iii) ingress and egress over the property of Pinnacle . . . to support the activities described in this Agreement.  . . .

[7] Section 7 of the Agreement, which is titled "Compliance with Laws," provides, in pertinent part:

> In performing their respective obligations under this Agreement, Covol and Pinnacle shall comply in all respects with and undertake all responsibilities under all applicable . . . rules, regulations, . . . or other similar requirements of any federal, state, or local government, agency, court, or public authority ("Governmental Requirements"), including, but not limited to, those regulating or otherwise relating to environmental pollution and environmental control, safety, health, labor, such as, for example, Governmental Requirements under . . . the Federal Mine Safety and Health Act of 1977, as amended[;] . . . .

[8] Section 8 of the Agreement, which is titled "Licenses and Permits," provides, in pertinent part:
(Continued)

6

The Agreement provided for both Pinnacle and Covol to profit from the recovered coal fines. Sections 2 and 3 set out that Covol would sample and test the recovered coal fines to determine their quality. Depending on the levels of ash and moisture, the coal fines would be categorized as either "met coal" or "steam coal." See Agreement § 2. Met coal — which contains lower ash and moisture content and is therefore more valuable — would be purchased by an affiliate of Pinnacle, while Pinnacle had an option — but no obligation — to purchase steam coal. See id.

2.

Covol paid $14 million to purchase the processing facility, and then immediately spent another $4 million renovating it. Covol's coal fines recovery operations were under way by the summer of 2008. A number of issues and events arose in the following years that ultimately made it economically unfeasible for Covol to continue in the business. Covol ceased its operations at the Pinnacle mine in 2012.

---

Pinnacle shall maintain its existing permits that are required for its performance under this Agreement. Any additional permits required by Pinnacle for Covol's operations . . . shall be acquired by Pinnacle . . . .

7

The biggest obstacle Covol faced related to the water level of the impoundment. To extract the refuse material, Covol utilized a dredge machine with a mechanical arm that dipped into the water and dragged refuse material out of the impoundment. The mechanical arm was 25-feet long, meaning that the dredge could only reach the top 25 feet of water. Covol requested several times that Pinnacle adjust the water level so that Covol's dredge could capture refuse material located deeper in the impoundment. Pinnacle, however, declined to do so. Moreover, in 2011, Pinnacle adopted a new protocol that prevented it from pumping water out of the impoundment and lowering the water level (the "water management plan").[9] Without those adjustments to the water level, Covol was able to extract only a portion of the refuse material.

---

[9] West Virginia regulations concerning selenium contamination of surface water required Pinnacle to change its operations in order to come into regulatory compliance. See W. Va. Code R. §§ 47-30-1 to 47-30-15 (2009). Selenium is an antioxidant that has been naturally found in West Virginia coal, rocks, and soil. See J.A. 1637. Although humans require a very small amount of selenium, it "can be toxic in larger amounts and has been found to cause reproductive problems in some aquatic animals." Id. Pinnacle had at least two options: (1) a water management plan, that would control selenium contamination by essentially recycling the water in the impoundment, so that it would not be released; and (2) a water treatment plan, that would reduce the amount of selenium contained in the water through a chemical process. Pinnacle selected the water management plan. See id. at 1652-58.

8

Throughout Covol's coal fines recovery operations under the Agreement, the parties were subject to mine plans required by the federal Mine Safety and Health Administration (the "MSHA"), see 30 C.F.R. §§ 77.216-77.217 (2008), and operating permits required by the West Virginia Department of Environmental Protection (the "WVDEP"), see W. Va. Code R. §§ 38-2-1 to 38-2-14 (2008). As of 2008, a mine plan was in effect that had been submitted in 2002 and approved prior to Beard opening the processing facility (the "Beard mine plan"). Covol operated under that plan from 2008 until August 2010, when the first two phases of a modified mine plan (the "modified mine plan") were approved by both the MSHA and the WVDEP.[10] During the parties' relationship under the Agreement, an approved mine plan required that any mining of the impoundment be performed concomitant with an incremental lowering of the water level.[11]

---

[10] Covol had pursued modifications to the Beard mine plan in order to conduct the spoil removal project, which is described infra at 10.

[11] The Beard mine plan described two phases of operations for removing coal fines from the impoundment, and stated that the water level would be lowered "between 15 and 30 feet" during phase 1, and "an additional 20 to 30 feet" during phase 2. See J.A. 2026. The modified mine plan set out six phases of operations, although only two of those phases were approved by both the MSHA and the WVDEP. That plan called for the water level of the impoundment to be lowered in 25-foot increments. See id. at 2014.

Beyond the problems Covol encountered in accessing the refuse material located deeper than 25 feet below the surface of the impoundment, it also faced a decline in the quality of coal fines. When Covol began its operations at the Pinnacle mine, Pinnacle's wash plant was relatively inefficient, meaning that it left a high level of coal in the refuse material. That remaining coal was of good quality in terms of ash and moisture content. Covol, then, benefited from the wash plant's inefficiency on the front end because it could recover that coal on the back end. During the negotiations leading up to the 2008 Agreement, Pinnacle was aware that the wash plant was inefficient and outdated, though it did not inform Covol of any plans to update the wash plant. In fact, Pinnacle did not approve that upgrade until 2009. It subsequently notified Covol of those plans in July 2010. Pinnacle completed its upgrades to the wash plant in 2011.

In the face of those obstacles to its coal fines recovery operations, Covol attempted to maximize the areas of the impoundment that could be mined. Initially, Covol was restricted as to what portions of the impoundment its dredge could reach under the Beard mine plan. Once the modified mine plan was approved, Covol invested $4 million to excavate spoil material from the banks of the impoundment, giving Covol new access to millions of tons of coal fines (the "spoil removal

project"). That expenditure was properly approved in October 2010 and the project was completed in 2011. Covol realized no benefit from the spoil removal project, however, because its coal fines recovery operations had become economically unfeasible as a result of the static water level of the impoundment. Therefore, in 2011, Covol was soliciting offers to sell its business.

Covol filed this civil action against Pinnacle in the Southern District of West Virginia on August 7, 2012, alleging four causes of action. First, Covol charged Pinnacle with breaching the Agreement, maintaining that Pinnacle had violated its obligations under both the express terms of the Agreement and the implied covenant of good faith and fair dealing. Covol claimed damages including lost profits from its share of more than $100 million worth of coal. Second, Covol asserted a tort claim for fraudulent concealment, alleging that Pinnacle hid its intentions to renovate the wash plant and to implement the water management plan while Covol was spending millions of dollars to renovate the processing facility and undergo the spoil removal project. Third, Covol asserted another tort claim for negligent misrepresentation, predicated on the theory that Pinnacle had breached its duty to provide Covol with material information by failing to disclose its plans relating to the wash plant and

11

water management plan. Fourth, Covol alleged an unjust enrichment claim stemming from the monetary benefit that Pinnacle received due to Covol's investment in the spoil removal project.

After discovery had been completed, on October 17, 2013, Pinnacle moved for summary judgment on all four claims. Following briefing, the district court, as explained in its Opinion, granted Pinnacle summary judgment as to each claim.

With respect to Covol's breach of contract claim, the district court determined that the Agreement is not ambiguous, and thus undertook to identify and enforce its plain and natural meaning. See Opinion 15. More specifically, the Opinion rejected Covol's contentions that sections 1, 4, 8, and 18 of the Agreement gave Covol a right to access the refuse material. Id. at 16-19. Alternatively, the court determined that even if the Agreement did provide such a right, "allowing Covol access to the bottom of the impoundment pond does not require Pinnacle to affirmatively lower the water level." Id. at 17. The court further reasoned that, as a matter of law, Pinnacle did not breach the Agreement because "Covol simply had to deal with more water in the impoundment where the refuse material was located," and "the Agreement explicitly disclaims any warranty regarding the quantity or quality of the refuse material." Id. at 20-21. The court surmised that "Pinnacle may have made business

12

decisions that ultimately made Covol's operations more difficult, but no evidence indicates that Pinnacle breached the [Agreement]." Id. at 21. Given that Covol could not succeed on its contract claim arising under the terms of the Agreement, the court ruled that Covol's good faith and fair dealing theory must similarly fail. That was so because "there is no avenue through the applicable case law that affords Covol an independent cause of action for a breach" of that covenant. Id. at 22.

Next, the district court analyzed Covol's two tort claims together. The Opinion briefly explained that the claims would not succeed on their merits, but emphasized that the tort claims were barred by the gist of the action doctrine because "they would not arise independent of the existence of the [Agreement]." See Opinion 26. Finally, the court granted summary judgment on Covol's unjust enrichment claim because "the subject matter of this claim involves the performance of an express contract," which "cannot be the basis of an unjust enrichment claim" under applicable law. Id. at 30.

Covol has timely noticed this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

We review de novo a district court's grant of summary judgment. See Desmond v. PNGI Charles Town Gaming, LLC, 630

13

F.3d 351, 354 (4th Cir. 2011). In so doing, "it is elementary that . . . '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor.'" Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 283 (4th Cir. 2013) (en banc) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). Summary judgment may be granted only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Libertarian Party of Va. v. Judd, 718 F.3d 308, 312-13 (4th Cir. 2013) (internal quotation marks omitted). A dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party." Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248.

### III.

On appeal, Covol contends that the district court erred in granting summary judgment on its breach of contract claim and on its tort claims. Covol requests that the judgment be vacated and the matter remanded for trial.

### A.

We begin by addressing Covol's breach of contract claim. Covol asserts that Pinnacle breached the Agreement by failing to

14

lower the water level of the impoundment, thereby interfering with Covol's ability to access the coal fines contained therein. Pinnacle, meanwhile, disputes that it was under any obligation to adjust the water level. Covol maintains that such a duty was created by both the express terms of the Agreement and by the implied covenant of good faith and fair dealing. We address those contentions in turn.

1.

First, whether the terms of the Agreement obliged Pinnacle to adjust the water level of the impoundment hinges on the language of that contract. The Agreement makes no explicit reference to water levels. Covol nevertheless relies on sections 1, 4, 7, 8, and 18 of the Agreement — individually and in combination — as bestowing on Covol a right to access the refuse material in the impoundment and imposing a corresponding duty on Pinnacle to adjust the water level.

The Supreme Court of Appeals of West Virginia has explained that, in construing a contract, a reviewing court must first determine whether the contract is ambiguous, meaning that the language is "reasonably susceptible of two different meanings," or "that reasonable minds might be uncertain or disagree as to its meaning." See Syl. Pt. 4, Estate of Tawney v. Columbia

Natural Res., LLC, 633 S.E.2d 22, 23-24 (W. Va. 2006).[12]  Whether or not a contract is ambiguous is a question of law.  See Syl. Pt. 5, id. at 24.   If the contract is unambiguous, then the court should enforce its terms according to the plain and natural meaning of the language used without considering extrinsic evidence.  See Payne v. Weston, 466 S.E.2d 161, 166 (W. Va. 1995).  If, however, the contract is ambiguous, then extrinsic evidence may be consulted to discern what the parties intended the rights and obligations of the agreement to include. See id.  Importantly, "when the document has been found to be ambiguous[,] . . . the determination of intent through extrinsic evidence become[s] a question of fact," rather than a question of law.  Id.

a.

In section 18 of the Agreement, Pinnacle undertakes several duties regarding Covol's right to access its property.  Relevant here, section 18(ii) provides that Pinnacle must

> provide . . . any right-of-way reasonably needed by Covol to transport the Refuse Material from the [impoundment] to the processing [facility].

---

[12] Pursuant to the Constitution of West Virginia, the Supreme Court of Appeals of West Virginia articulates new points of law through its syllabus.  See W. Va. Const. art. VIII, § 4 ("[I]t shall be the duty of the court to prepare a syllabus of the points adjudicated in each case in which an opinion is written in which a majority of the justices thereof concurred, which shall be prefixed to the published report of the case.").

16

Section 18(ii) clearly gives Covol a right-of-way relating to the refuse material. The parties disagree, however, as to the meaning of the term "from the [impoundment]," and whether that term required Pinnacle to adjust the water level of the impoundment. We therefore must determine whether section 18(ii) is ambiguous on that point.

Covol characterizes section 18(ii) as requiring Pinnacle to provide a right-of-way within the impoundment itself, such that Pinnacle must adjust the water level in order for Covol to retrieve the refuse material. That interpretation is reasonable, given that the provision obliges Pinnacle to provide "any right of way reasonably needed." See Agreement § 18(ii). Pinnacle maintains that section 18(ii) only speaks to Covol's right to transport "over the land from the Impoundment to the Processing Facility," suggesting that the right-of-way begins at the edge of the impoundment. See Br. of Appellee 31. That interpretation is also reasonable because the term "from the [impoundment]" makes no explicit reference to the right-of-way extending into the impoundment. A third reasonable reading of section 18(ii) could be somewhere in the middle: that it provides Covol a right-of-way within the impoundment to access any refuse material that Covol could reach without Pinnacle manipulating the water level. Thus, there are at least three

17

reasonable interpretations of section 18(ii), indicating that the provision is ambiguous.

A broader reading of the Agreement underscores the ambiguity. Section 18(ii) describes Covol's right with respect to transporting refuse material, and "refuse material" is broadly defined in section 1 of the Agreement to include "coal waste material . . . located at" Pinnacle's refuse site. In section 4, Covol undertakes to "purchase . . . all or part of the Refuse Material produced, previously, currently and any in the future, from Pinnacle's Mining Operations in Wyoming County." A reasonable construction of the term "refuse material" can encompass the material as it sits in the bottom of the impoundment, having been pumped in from Pinnacle's wash plant. Section 18(ii) may thus naturally be interpreted as giving Covol the right-of-way to extract the refuse material from the impoundment. In all, we are satisfied that section 18(ii) is ambiguous and can be reasonably interpreted in alternative ways.

Because section 18(ii) is ambiguous, extrinsic evidence may be considered in order to resolve the factual question of what the parties intended. If a reasonable jury could decide that question in favor of Covol, then a genuine dispute of material fact exists, precluding summary judgment. See Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012) ("A

18

genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party."). Covol relies on deposition testimony of William Boor, who testified on behalf of Pinnacle regarding the Agreement, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure.[13] Boor testified that Covol's intent in entering the Agreement was to remove refuse material from the impoundment. See J.A. 1324. Boor agreed that "the purpose of the [A]greement" was that "Covol wanted to get the [coal] fines out of the [impoundment]." Id. at 1325. When asked whether Covol would have entered into the Agreement if it would not be given access to the refuse material, Boor replied: "Yeah, that would be no deal. I mean, the purpose of the deal was for their business plan to clean coal." Id. at 1325-26. He agreed that "to clean the coal you had to have access to the coal." Id. at 1326.

In light of that testimony, Covol has established a genuine dispute of material fact as to whether the parties intended for the right-of-way granted in section 18(ii) to require Pinnacle

---

[13] Rule 30(b)(6) of the Federal Rules of Civil Procedure pertains to depositions of organizations, including corporate entities. The organization is permitted to designate a person to testify on its behalf, and the organization is bound by that testimony. See Reilly v. Natwest Markets Grp., Inc., 181 F.3d 253, 268 (2d Cir. 1999).

19

to adjust the water level so that Covol could access the refuse material located in the impoundment. See Scites v. Marcum, 560 S.E.2d 505, 509 (W. Va. 2002) (explaining that size, location, and nature of right-of-way are factual questions to be decided by jury). We must remand because the proper interpretation of the Agreement can only be resolved by the trier of fact. See World-Wide Rights Ltd. v. Combe Inc., 955 F.2d 242, 245 (4th Cir. 1992).[14]

b.

Covol also contends that Pinnacle was obliged to adjust the water level of the impoundment based on the provisions of the mine plans. That argument relies on sections 7 and 8 of the Agreement. Section 7 required Pinnacle to comply with the law, including state and federal regulations. Section 8 required Pinnacle to "maintain its existing permits" and to acquire any additional permits needed in order for Covol to conduct its operations. Reading sections 7 and 8 in tandem, Covol contends that Pinnacle breached the Agreement when it violated the mine plans by refusing to lower the water level of the impoundment.

_____

[14] The district court's alternative ruling — that, if Covol was given some right to access the refuse material, that right did not encompass all refuse material in the impoundment or require Pinnacle to adjust the water level — is unpersuasive. That construction is not clear from the Agreement, and thus reflects a factual determination that could not be made against Covol in the summary judgment proceedings.

A threshold issue here is whether the mine plans should be incorporated into the Agreement. In order to incorporate a separate document into a contract, "a general reference" to the other document is not enough. See Syl. Pt. 2, State ex rel. U-Haul Co. of W. Va. v. Zakaib, 752 S.E.2d 586, 589 (W. Va. 2013). Rather,

> (1) the writing must make a clear reference to the other document so that the parties' assent to the reference is unmistakable; (2) the writing must describe the other document in such terms that its identity may be ascertained beyond doubt; and (3) it must be certain that the parties to the agreement had knowledge of and assented to the incorporated document so that the incorporation will not result in surprise or hardship.

Id.

Taking the facts in Covol's favor, the parties were aware that mine plans — which could be modified — would govern operations at the Pinnacle mine. Nonetheless, the parties' awareness of the mine plans is not, by itself, sufficient to incorporate the terms of those plans into the Agreement. The Agreement does not clearly reference mine plans, nor does the contractual language expressly indicate that the parties intended for the terms of the mine plans to govern their contractual relationship. Therefore, the Agreement is the sole document memorializing the parties' agreements.

Next, Covol contends that, even if the terms of the mine plans are not incorporated into the Agreement, Pinnacle agreed

21

to abide by the terms of those mine plans, requiring it to adjust the water level. That argument hinges on section 7's provision that Pinnacle comply with all governmental requirements. Covol, however, did not raise section 7 in its opposition to summary judgment in the district court. See J.A. 1282-1316. Although that issue has not been squarely preserved for our review, we observe that whether section 7 obliged Pinnacle to adhere to the terms of the mine plans, and whether Pinnacle breached any such obligation, would raise factual issues that a jury must decide. In any event, a remand is required on the basis of section 18(ii) of the Agreement.

2.

Beyond the terms of the Agreement, Covol predicates its claim for breach of contract on a theory that Pinnacle breached the implied covenant of good faith and fair dealing by interfering with Covol's access to the refuse material and the coal fines contained therein. West Virginia's Uniform Commercial Code provides that: "Every contract or duty within this chapter imposes an obligation of good faith in its performance and enforcement." See W. Va. Code § 46-1-304 (2006). "Good faith" means "honesty in fact and the observance of reasonable commercial standards of fair dealing." Id. § 46-1-201(b)(20).

22

The district court ruled that Covol could not succeed on its good faith and fair dealing theory because Covol had not otherwise raised a genuine issue of material fact as to the terms of the Agreement. See Opinion 22 ("Having previously found that Pinnacle did not breach any duty [under the Agreement], there is no avenue through the applicable case law that affords Covol an independent cause of action for a breach of the covenant of good faith and fair dealing."). In light of our determination that Pinnacle is not entitled to summary judgment with respect to Covol's theory that Pinnacle breached the Agreement, we are satisfied that summary judgment should not have been granted as to Covol's allegation that Pinnacle breached the implied covenant of good faith and fair dealing.

3.

Overall, then, section 18(ii) of the Agreement is ambiguous as to whether Covol had the right to access the refuse material located within the impoundment, thereby requiring Pinnacle to adjust the water level of the impoundment. We therefore vacate the district court's award of summary judgment on Covol's breach of contract claim and remand.[15]

---

[15] The parties have focused much attention on the reasons that Pinnacle did not lower the water level of the impoundment, such as its efforts to comply with state regulations concerning selenium contamination. But whether Pinnacle was required to take some action to comply with the law does not affect whether
(Continued)

23

Covol also disputes the district court's award of summary judgment as to its tort claims for negligent misrepresentation and fraudulent concealment.[16] As to both of those claims, Covol relies on alleged misstatements and concealments by Pinnacle with respect to Pinnacle's intention to adjust the water level of the impoundment and its intention to upgrade the wash plant.

We are satisfied, as was the district court, that Covol's tort claims are barred by the gist of the action doctrine. That doctrine is meant "to prevent the recasting of a contract claim as a tort claim." Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP, 746 S.E.2d 568, 577 (W. Va. 2013). It applies if any one of four factors is present, including:

> (1) where liability arises solely from the contractual relationship between the parties; (2) when the alleged duties breached were grounded in the contract itself; (3) where any liability stems from the contract; and

the Agreement required Pinnacle to adjust the water level of the impoundment.

[16] Under West Virginia law, "[f]raudulent concealment involves the concealment of facts by one with knowledge or the means of knowledge, and a duty to disclose, coupled with an intention to mislead or defraud." See Trafalgar House Constr., Inc. v. ZMM, Inc., 567 S.E.2d 294, 300 (W. Va. 2002). Negligent misrepresentation, in turn, can be established where a person "under a duty to give information to another . . . makes an erroneous statement when he has no knowledge on the subject, and thereby misleads the other to his injury." See Folio v. City of Clarksburg, 655 S.E.2d 143, 151 (W. Va. 2007).

(4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim.

Id. (quoting Star v. Rosenthal, 884 F. Supp. 2d 319, 328-39 (E.D. Pa. 2012)).  In Gaddy, the Supreme Court of Appeals of West Virginia observed that "whether a tort claim can coexist with a contract claim is determined by examining whether the parties' obligations are defined by the terms of the contract." Id.

The Gaddy decision is instructive here.  Gaddy involved a verbal fee agreement between an attorney and an engineering company.  The company alleged that the agreement included a promise by the lawyer to pay the company one-third of certain recovered revenues, but the lawyer disagreed that such a promise was ever made.  The company thereafter brought both contract and tort claims premised on that asserted recovered-revenue agreement.  The Gaddy court determined that the gist of the action doctrine barred the company's tort claim because that claim "simply redoubled [the company's] efforts in trying to prove the existence of the [disputed provision]."  Gaddy, 746 S.E.2d at 577.  As such, the tort claim was "simply [a] breach of contract claim[] masquerading as" a tort.  Id.

Put succinctly, the same is true here.  Covol's assertions that Pinnacle made misrepresentations or concealed its intention

25

regarding the water level of the impoundment simply recast Covol's claim for breach of contract. And with respect to the alleged misstatements or concealments as to the wash plant, any liability would be defined by the Agreement, wherein Pinnacle expressly disclaimed any warranty as to the quality of refuse material in the impoundment. See Agreement § 20.

In sum, Covol's claims for tort liability are barred because the gist of those actions sounds in contract. The district court therefore properly granted judgment to Pinnacle on the fraudulent concealment and negligent misrepresentation claims.

IV.

Pursuant to the foregoing, we affirm the district court's awards of summary judgment as to Covol's tort claims, vacate with respect to Covol's claim for breach of contract, and remand for such other and further proceedings as may be appropriate.

AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED

FLOYD, Circuit Judge, dissenting in part and concurring in part:

In my view, nothing in the Agreement's plain language requires Pinnacle to pump water to facilitate Covol's coal operations. In holding otherwise, I believe the majority conjures an ambiguity where there is none, erring in two fundamental respects. Accordingly, except in regard to Part III.B of the majority's opinion, I respectfully dissent.

First, the majority tacitly attributes a meaning to "right-of-way" that is anything but "plain and ordinary." Berry v. Mountain Air Prop. Owners Ass'n, No. 13-1324, 2014 WL 5312274, at *3 (W. Va. Oct. 17, 2014). A "right-of-way" is "[t]he right to pass through property owned by another." Black's Law Dictionary 1522 (10th ed. 2014). Although a landowner cannot interfere with the use of a right-of-way, a landowner has no duty to maintain or facilitate its use for the grantee's benefit. See, e.g., Greiner v. Columbia Gas Transmission Corp., 41 F. Supp. 2d 625, 631 (S.D. W. Va. 1999); Restatement (Third) of Property: Servitudes § 4.13(2) (2000); James W. Ely, Jr. & Jon W. Bruce, The Law of Easements & Licenses in Land § 8.22 (2014). Thus, the pertinent part of § 18 provides Covol only the right to pass through Pinnacle's property; it clearly does not impose an affirmative obligation on Pinnacle to facilitate Covol's passage and suit Covol's changing needs.

27

Second, the majority fails to construe the Agreement "as a whole, taking and considering all the parts together."  Faith United Methodist Church & Cemetery of Terra Alta v. Morgan, 745 S.E.2d 461, 481 (W. Va. 2013) (quoting Maddy v. Maddy, 105 S.E. 803, 803 (W. Va. 1921)).  Specifically, the majority overlooks the significance of § 20, which provides:

> Pinnacle makes no representation as to the character or quality or amount of the Refuse Material Covol removes or receives. Pinnacle HEREBY DISCLAIMS ANY WARRANTIES, EXPRESS OR IMPLIED, IN CONNECTION WITH THE REFUSE MATERIAL.  . . .  Pinnacle has not made any representation or warranty to Covol regarding the suitability or safety of Pinnacle's property for the processing of the Material as contemplated by this Agreement.

J.A. 85-86 (capitalization in original).  Given Pinnacle's express disclaimers regarding the amount of material that Covol should expect to recover and the suitability of Pinnacle's property for Covol's operations, it is hard to see how Pinnacle had an affirmative obligation to pump water and alter the conditions of its property simply to allow Covol to access more material.

In summary, unless one attributes a novel meaning to "right-of-way" and isolates § 18 from the rest of the Agreement, the Agreement unambiguously does not impose any obligation on Pinnacle to pump and lower water for Covol's benefit.  As a

28

result, I respectfully dissent and would affirm the lower court's determination in full.